[This opinion has been published in *Ohio Official Reports* at 87 Ohio St.3d 424.]

THE STATE OF OHIO, APPELLEE, *v*. SMITH, APPELLANT.

[Cite as *State v. Smith*, 2000-Ohio-450.]

*Criminal law–Aggravated murder–Death penalty upheld, when.*

(No. 98-912—Submitted October 12, 1999—Decided January 5, 2000.)

APPEAL from the Court of Appeals for Lorain County, No. 96CA006331.

———————————

{¶ 1} On the morning of January 19, 1994, a partially clad male body was found in a Cleveland cemetery. Two weeks later, the body was identified as that of Ronald Lally of Elyria. Over a year later, defendant-appellant, Raymond Smith, and two others including his son, Danny Smith, were indicted for aggravated murder, a firearm specification, and a death penalty specification, alleging that Lally was purposely killed to prevent his testimony in a separate criminal proceeding. Subsequently, a jury found appellant guilty as charged, and he was sentenced to death.

{¶ 2} In June 1993, Ronald Lally contacted the Elyria police and advised them that he wanted to reform himself and stop doing drugs. He felt the best way he could do that was to turn in his supplier. Lally signed an agreement with Elyria Police Detective Alan L. Leiby to become a confidential informant for the Elyria Police Department. On June 7, 1993, with Leiby's assistance, Lally was wired with a hidden monitoring device and made a controlled drug buy of crack cocaine from Danny and appellant. As a result of the controlled buy, police arrested Danny and appellant in August 1993 and charged them with aggravated drug trafficking. Both cases were eventually set for trial on January 19, 1994.

{¶ 3} Lally's fiancée, Sandra Williams, testified that on September 7, 1993, Danny approached her in her yard. Danny said he knew where Lally was and told

her that Lally would feel "real bad" if anything happened to her or to members of Lally's family. Danny also told Williams that he knew where Lally's parents lived and that it would be a shame if their trailer happened to get blown up.

{¶ 4} On the afternoon of September 15, 1993, Police Officer John Homoki responded to a disturbance call at the Mr. Hero's restaurant on Middle Avenue in Elyria. As he pulled into the Mr. Hero's parking lot, Homoki noticed Stan Jalowiec turn around and walk away from the area. He then saw Lally and Danny talking in front of the store doorway. Lally appeared to be extremely upset.

{¶ 5} Lally hurried across the lot to Homoki's cruiser and told Homoki: "John, these guys are going to fuck me up." Lally explained that he was a police informant, that he had bought drugs from these individuals, and that they had threatened to kill him. Homoki yelled over to Jalowiec to stand by, and then approached Danny, who said excitedly while pointing to Lally: "That punk ass bitch * * * is going to get his." Danny then denied that he was threatening Lally. Consequently, Homoki asked Lally if he wanted to pursue charges for intimidation, but Lally declined, saying that he just wanted to get out of the area.

{¶ 6} A few months before January 1994, Danny approached Terry Hopkins and asked him to "kill somebody," but Hopkins declined. Danny told Hopkins that he wanted the person killed "because he had informed the police of his doings."

{¶ 7} Brian Howington, a nephew of Joann Corrine Fike, knew appellant through his visits to his aunt's house. On the evening of January 18, 1994, Howington went with Jalowiec to a couple of bars in his aunt's car, a Chrysler LeBaron convertible. Jalowiec asked Howington to take him to "a friend's house," and the pair went to Lally's apartment on Middle Avenue. There, they smoked crack cocaine with Lally and his roommate. Around 10:00 p.m., the group went over to the aunt's house, "partied some more and shot some pool." Jalowiec received a message or a page on his beeper, and he asked Howington if he could

borrow the aunt's LeBaron. At first, Howington said no, but after Jalowiec pleaded with him repeatedly, Howington relented and let him borrow the LeBaron. According to Howington, Jalowiec and Lally left the aunt's house at around midnight.

{¶ 8} Around 11:00 p.m., Sharon Hopkins went to Razzle's bar in Elyria with her brother Terry Hopkins, appellant and his two sons, Michael and Danny Smith, and several other people including Stan Jalowiec. The group stayed at Razzle's until it closed, and then went to eat at Mom's Open Kitchen until around 2:45-3:00 a.m. However, Jalowiec was not with the group at Mom's Open Kitchen. After leaving Mom's Open Kitchen, Sharon Hopkins rode in a car driven by Danny that included Michael and appellant. The car went past the railroad tracks on Middle Avenue whereupon appellant and Michael Smith got out of the car and walked over to a barn in the woods. Danny drove the car back across the tracks and into a parking lot where he parked the car with the lights off.

{¶ 9} Around five to ten minutes later, a LeBaron convertible went past the parking lot, over to where appellant and Michael were dropped off. Shortly thereafter, the LeBaron drove back across the tracks and proceeded north towards town. Danny then followed the LeBaron in his car and signaled the driver to pull over. Danny ducked down in the driver's seat, and Sharon Hopkins noticed that Jalowiec was driving the LeBaron and that there were three other people in the vehicle. However, Sharon could not identify the other occupants of the LeBaron. Danny then drove away and dropped Sharon off at her apartment.

{¶ 10} At around 3:30 that January morning, Terry Hopkins arrived at Danny's apartment after the group had left Mom's Open Kitchen. Danny was there and appeared to be "nervous, bothered." Danny said "he was sick." He also said "they did it." Thereafter, Terry left and went to his sister's apartment.

{¶ 11} After daybreak, Terry returned to Danny's apartment and found appellant, Danny, and Michael there with Jalowiec. While Terry Hopkins could

not recall who specifically made what statement, he believed that Jalowiec said that "they had killed the guy." Moreover, "[t]hey said that they had shot the victim and they had run him over with a car and stepped on him and stabbed him with something * * *." According to Terry, "they were bragging about it."

{¶ 12} At approximately 5:00 or 6:00 a.m. that same morning, appellant and Jalowiec returned the LeBaron convertible to Fike. According to Fike, the weather that morning was extremely cold and the car was covered with ice. According to Howington, the car was frozen because Jalowiec and appellant had just washed it. Fike noticed some blood in the car and also noticed that Jalowiec's knuckles were bleeding. But appellant and Jalowiec told Fike that there had been a fight behind Mom's Open Kitchen.

{¶ 13} At approximately 9:55 a.m. on January 19, Cleveland Police Detective Michael Beaman answered a call reporting that a male body had been found on a driveway in a cemetery on Quincy Avenue in Cleveland. The partially clad and bloody body was lying face down on a cemetery roadway. The victim's shirt and coat were lying nearby on a snow mound, but there was no identification on or near the victim. Approximately two weeks later, Lally's family contacted Cleveland police about their missing relative from Elyria. Subsequently, members of the Lally family came to the Cuyahoga County Coroner's Office and identified the victim as Ron Lally. As a result of Lally's death, the aggravated trafficking charges against appellant and Danny Smith scheduled for trial on January 19 were dismissed.

{¶ 14} Deputy coroner Dr. Heather N. Raaf, who performed the autopsy on Lally, concluded that Lally died from a non-fatal bullet wound to the head, and blows to the head causing brain injuries and a skull fracture. Dr. Raaf also noted that Lally had been cut in the neck with a knife. Dr. Raaf stated that if Lally was "not quite dead" when he was left in the cemetery, exposure to the cold would probably have contributed to his death in combination with the injuries he

sustained. Dr. Raaf estimated the time of death to be somewhere between 2:30 a.m. and 8:30 a.m. on January 19.

{¶ 15} The murder remained unsolved for several months. However, in June 1994, Danny Smith contacted Detective Leiby, hoping to make a deal on other criminal charges he was facing. Danny told Leiby that he would make a statement about his father (appellant) and the Lally homicide. Danny indicated that his father would not tell him the "whole story" of the Lally homicide, and that Leiby would have to speak with appellant directly. At one point, Danny offered to "wear a wire and talk to his father concerning the homicide."

{¶ 16} On July 5, 1994, Leiby and two other detectives interviewed appellant on audiotape at Elyria police headquarters. After being advised of his *Miranda* rights, appellant told the detectives he had been riding in a car with Lally that was driven by a friend of Lally's. Appellant stated that at that time they were riding around smoking crack, and that Lally told him that he was not going to testify against him and Danny and that he was going to leave town. However, after about forty-five minutes of getting high on crack in the car, Lally demanded to know where Danny was because Danny "did somethin' to [Lally] at * * * Mr. Hero's * * *." Lally then pulled a gun on appellant. Continuing, appellant said that Lally cooled down some but then went back at him. According to appellant, this change of moods by Lally occurred several times in the car. Appellant had asked to get out of the car, but Lally refused to let him out.

{¶ 17} After driving around Cleveland, Lally eventually directed the driver into a cemetery. There, Lally ordered appellant out of the car and made him get on his knees with his hands in his pockets. Lally was standing up against the car, still smoking crack and holding a gun. Appellant then hit Lally's leg and knocked him down. A struggle ensued, and according to appellant "[s]ome how the gun went off." Appellant claimed he ran off and hid behind a tombstone until the driver of the car left. He then walked out of the cemetery, went to a bus station, and took a

"chitney" (*sic*) back to Elyria. He claimed that he did not know that Lally was dead until he read about it in the newspaper.

{¶ 18} Subsequently, Danny contacted Leiby and asked him if he was satisfied with appellant's statement concerning the Lally homicide. Danny indicated that appellant was willing to make another statement. Leiby told Danny that he would speak to appellant only if he named the other person who was at the cemetery on the night Lally was killed.

{¶ 19} On January 11, 1995, appellant had a taped phone conversation with Leiby. In that conversation, appellant was still attempting to help Danny out on pending charges filed against him. As a sign of good faith, appellant told Leiby, "it's Stan," meaning the name of the person who was with him and Lally at the cemetery.

{¶ 20} On March 8, 1995, the grand jury indicted appellant on one count of aggravated murder with a firearms specification. In addition, a death penalty specification alleged that appellant purposely killed Lally in order to prevent his testimony as a witness in a separate criminal proceeding. R.C. 2929.04(A)(8).

{¶ 21} Prior to trial, the court held a hearing to determine the admissibility of a deposition by Michael Smith, appellant's other son. The court had permitted Michael's deposition to be taken on June 16, 1995, in order to preserve his testimony. The state proffered two witnesses (Detectives Beaman and Leiby) who testified that Michael was not available to testify at trial in spite of numerous efforts to locate him. The trial court ruled that the deposition would be admitted unless Michael was found.

{¶ 22} Trial was held before a jury. After both parties had rested, the prosecutor informed the trial judge that Leiby had talked on the telephone with Michael Smith, who was out of the state. Michael stated he was afraid of being arrested for probation violations. The prosecutor authorized Leiby to tell Michael that they would pay his way to come back and testify but that they could not promise

him anything with regard to his probation. After Leiby told Michael this, he did not hear from him again.

{¶ 23} In his deposition, which had been subject to cross-examination by counsel for all three co-defendants (appellant, Danny Smith, and Stan Jalowiec), Michael testified that he witnessed the murder of Lally, which took place around 4:30 a.m. in early January 1994. Michael stated that at around 2:45 that morning he met his father (appellant) and brother Danny at Mom's Open Kitchen in Elyria. Appellant made a phone call and the three left the restaurant in Danny's car. Danny drove Michael and appellant down Middle Avenue and dropped them off near the railroad tracks.

{¶ 24} Approximately twenty to thirty minutes later, Jalowiec drove up in a blue LeBaron with Lally. Michael got in and sat in the back seat (driver side) next to Lally, and appellant sat in the front passenger seat. After they drove around a little while, appellant pointed a pistol at Lally and told him "Don't make no stupid moves." Lally at first denied setting Danny up in a controlled drug buy but later admitted that he had. Michael stated that at this point, Lally agreed to get on a bus to leave town. Jalowiec drove the car into East Cleveland in order to buy more crack. All during the trip, all four men were smoking crack cocaine. After seeing some police cars and fire trucks in East Cleveland, the group decided not to buy more crack, but drove around Cleveland for another forty-five minutes and ended up at the Woodland Cemetery in Cleveland.

{¶ 25} When Stan stopped the car in the cemetery, appellant got out of the car and pointed his gun at Lally's face to force him out of the car as well. Michael heard appellant and Lally exchange words. He then heard a gunshot. Lally exclaimed: "Oh, you shot me in the head. You shot me in the head." Appellant asked Michael and Jalowiec to get out of the car. However, only Jalowiec got out and helped appellant beat up Lally. Appellant said something about the gun being jammed and asked Jalowiec for a knife. During this time, Michael could hear "the

thumps and the smacks and the stomps." During the beating Lally pleaded: "I won't tell nobody. Don't kill me. Please don't kill me." Those were the last words Michael heard from Lally.

{¶ 26} Appellant and Jalowiec tried to stuff Lally into the trunk, but he would not fit. Appellant and Jalowiec got back in the car, and Jalowiec tried to back the car up over Lally's body two or three times. However, each time Lally's body would stop the car's movement. Jalowiec then drove the car out of the cemetery, and he and appellant began to argue with Michael over what he should have done at the cemetery. During this time, appellant took his gun apart, throwing it away piece by piece out the window. Eventually, Michael was dropped off at his brother Danny's apartment.

{¶ 27} Two of the state's witnesses at trial worked at the trace evidence lab of the Cuyahoga County Coroner's Office. Sharon Rosenberg testified that there was no evidence that Lally had fired a weapon. Linda Luke testified that red discoloration on a trunk liner piece from the LeBaron convertible tested out to be blood with DNA consistent with that of Ron Lally.

{¶ 28} After the state rested, the defense presented one witness who was called to rebut Leiby's testimony that appellant threatened his son Michael at the close of his deposition. Leiby had testified that appellant declared at the end of Michael's deposition, "I raised the boy, now I got to kill him." The defense's sole witness, a private investigator who attended the deposition, testified that he construed appellant's comment as a non-threatening question. The state's rebuttal witness, a deputy sheriff, felt that appellant's statement was a serious threat. After deliberation, the jury found appellant guilty as charged.

{¶ 29} At the mitigation hearing, appellant gave an unsworn statement claiming that he never killed Ron Lally. Also testifying on appellant's behalf were three relatives and the spouse of a cousin. The jury recommended death, and the court imposed the death sentence on appellant.

{¶ 30} Upon appeal, the court of appeals affirmed the conviction and death sentence.

{¶ 31} The cause is now before this court upon an appeal as of right.

―――――――――――

*Gregory White,* Lorain County Prosecuting Attorney, and *Jonathan E. Rosenbaum,* Assistant Prosecuting Attorney, for appellee.

*Irving B. Sugerman* and *Nicholas Swyrydenko,* for appellant.

―――――――――――

**ALICE ROBIE RESNICK, J.**

{¶ 32} Appellant, Raymond Smith, has raised eleven propositions of law. We have reviewed each and have determined that none justifies reversal of appellant's conviction for aggravated murder. Pursuant to R.C. 2929.05(A), we have also independently weighed the aggravating circumstance against the evidence presented in mitigation, and reviewed the death penalty for appropriateness and proportionality. For the reasons that follow, we affirm appellant's conviction and death sentence.

VOIR-DIRE/PRETRIAL ISSUES

*Admission of Deposition*

{¶ 33} In his second proposition of law, appellant argues that his right to confront witnesses against him was violated when the court permitted, and then admitted, the deposition of Michael Smith without a showing that Crim.R. 15(F) was satisfied.

{¶ 34} Michael Smith testified that he witnessed the Lally murder. Prior to voir dire, defense counsel raised the issue of whether the defense's motion to suppress Michael's deposition should have been granted, and a colloquy took place between the parties and the trial judge. The judge indicated that when he permitted the taking of the deposition on June 16, 1995, it was done with the understanding that Michael was going to testify at trial and that "it had to be a damn good reason

why he wouldn't." The court at that time declined to disturb its denial of the defense motion to suppress.

{¶ 35} However, during the voir-dire process, the court conducted a hearing regarding the admissibility of Michael Smith's deposition. Cleveland Police Detective Michael Beaman testified that he had been trying to locate Michael Smith in the Cleveland area for several months without success. Although Michael Smith was leasing an apartment in Cleveland that was current on rental payments, Beaman could not find him even with the assistance of the landlord, neighbors, and the county housing authority police. Beaman was also unsuccessful in locating Michael Smith through phone calls of numbers that Michael Smith had phoned during the time he was staying at the prosecution-provided motel room at the time just prior to his deposition.

{¶ 36} Leiby testified that Michael Smith contacted him on June 5, 1995, and told him that he received what "we felt was a death threat." Leiby further stated that at the close of Michael's deposition, appellant threatened Michael by saying, "I raised the boy and now I have got to kill him." Subsequent to giving the deposition, Michael failed to report to his probation officer and a warrant was issued for his arrest.

{¶ 37} In August 1995, Michael Smith was located and was held in the Cuyahoga County Jail for two days with the intent of transferring him to the Lorain County jail facility. However, Cuyahoga County authorities had no warrant on Michael, so the jail refused to hold him. Leiby stated that they were also concerned about Michael's safety at the Lorain County Jail, since both appellant and Jalowiec were being held there. Therefore, they decided at that time that Michael would be released early. Yet, four or five weeks later, Michael again failed to contact his probation officer and another warrant was issued for his arrest. Numerous attempts by Leiby to locate Michael were unsuccessful, even though Michael indicated at his deposition that he would be available to testify at trial. Leiby further stated that

they took the deposition, since the prosecution was concerned for Michael's health and well-being. Among other things, Michael had attempted suicide on April 2, 1995. At the close of the hearing, the trial court ruled that the deposition would be allowed unless Michael was found.

{¶ 38} Before closing argument at the trial phase, the prosecutor informed the court that Michael Smith had telephoned Detective Leiby from out of state two days earlier and indicated his willingness to testify. However, Michael was afraid that there were probation warrants out for his arrest. Leiby informed Assistant Prosecutor Rosenbaum of the phone call, and Rosenbaum told Leiby to tell Michael that he would pay for Michael's way to come back from wherever he was to testify. However, Rosenbaum could not make any promises regarding his probation. Michael called Leiby back that same night, and Leiby informed him of the situation. After that conversation, the state did not hear from Michael again. Subsequently, the deposition was submitted to the jury as an exhibit during its deliberations.

{¶ 39} Crim.R. 15(F) provides: "[A] part or all of a deposition * * * may be used if it appears: * * * that the witness is out of the state, unless it appears that the absence of the witness was procured by the party offering the deposition * * *."

{¶ 40} Here, the testimony indicated that Michael Smith was out of the state and that reasonable efforts by the state to make him available to testify at trial were unsuccessful. The state's efforts to procure Michael's live testimony appear to have been reasonable, adequate, and made in good faith. The record indicates that the state continued to seek Michael's live testimony at trial up to the time when the case was submitted to the jury. There is no evidence that the state was responsible for or procured Michael's absence from Ohio. Rather, the record shows that Michael made himself unavailable because he felt that his life was in danger. Thus, the trial court did not abuse its discretion in admitting the deposition into evidence in light of Michael's unavailability to testify under Crim.R. 15(F). See, *e.g., State*

*v. Jenkins* (1984), 15 Ohio St.3d 164, 222, 15 OBR 311, 361, 473 N.E.2d 264, 313; *State v. Koontz* (1979), 65 Ohio App.2d 264, 269-270, 19 O.O.3d 246, 249-250, 417 N.E.2d 1272, 1276.

{¶ 41} Moreover, appellant's right to confront his accuser was not violated by the introduction of the deposition. Contrary to defense arguments, appellant was able to confront his accuser, Michael Smith, at the deposition. Appellant's defense counsel at the time cross-examined Michael, as did counsel for both co-defendants. Therefore, we overrule appellant's second proposition.

*Voir-Dire Errors*

{¶ 42} In his third proposition of law, appellant contends that the court erred in granting the state's motions to excuse prospective jurors Ellingsworth and Gosselin for cause. Appellant further asserts that the trial court erred in giving disparate treatment to prospective jurors by favoring those with "pro-death penalty" views.

{¶ 43} Appellant has waived these arguments by failing to raise them before the court of appeals. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph two of the syllabus; *State v. Hawkins* (1993), 66 Ohio St.3d 339, 348, 612 N.E.2d 1227, 1234. In addition, appellant failed to object to the excusal for cause of prospective juror Ellingsworth. The only voir-dire issues appellant raised in the court of appeals concerned two *Batson* claims that he has not raised before this court.

{¶ 44} Moreover, appellant's arguments under this proposition are without merit. While Ellingsworth equivocated as to whether she could impose a death sentence, she indicated several times that her views on the death penalty were so strong that they would interfere with her ability to consider imposing the death penalty. See, *e.g., State v. Beuke* (1988), 38 Ohio St.3d 29, 38, 526 N.E.2d 274, 284-285. Likewise, prospective juror Gosselin equivocated during voir-dire examination as to whether she could impose the death penalty. She admitted

several times that her views would substantially impair her ability to sign a death verdict, but stated at other times that she could vote for a death sentence. Under such circumstances, even had appellant preserved his objections, this court would defer to the trial judge who saw and heard the jurors. *Id.; State v. White* (1999), 85 Ohio St.3d 433, 439, 709 N.E.2d 140, 149.

{¶ 45} Last, appellant's allegation that the trial judge gave favorable treatment to "pro-death penalty" jurors is not borne out by the voir-dire transcript. The trial judge in fact excused a fair number of prospective jurors who expressed an inability to consider imposing a life sentence. Appellant's third proposition is overruled.

## TRIAL ISSUES

### *Out-of-Court Statements*

{¶ 46} In his first proposition of law, appellant complains that the trial court permitted, over defense objections, several out-of-court statements made by co-defendant Danny Smith. Appellant contends that the statements were irrelevant hearsay. He further submits that none of the statements by Danny qualified as exceptions to the hearsay rules, nor were they properly admitted as statements in furtherance of a conspiracy under Evid.R. 801(D)(2)(e).

{¶ 47} Appellant first complains of statements made by Danny to Elyria police officer John Homoki, who responded to a disturbance call on September 15, 1993, at a Mr. Hero's restaurant. The disturbance involving Danny, Jalowiec, and Lally occurred approximately four months before the murder, and around one month after both appellant and Danny were arrested for aggravated trafficking as a result of Lally's controlled buy of crack from them. Homoki testified that Danny pointed to Lally and declared, "[t]hat punk-ass bitch is going to get his." When Homoki asked Danny if he was threatening Lally, Danny responded that "[t]here is no reason to threaten the mother fucker."

**{¶ 48}** These statements readily appear to be relevant under Evid.R. 402, since the state's theory of the case was that appellant and co-defendants Danny Smith and Jalowiec conspired to kill Lally in retaliation for his role as a police informant making a controlled drug buy from appellant and Danny. The threatening statements by Danny, if believed, tended to show that Danny was agitated and angry with Lally at a time subsequent to his arrest for drug trafficking.

**{¶ 49}** Moreover, the statements were admissible as excited utterances under Evid.R. 803(2). Homoki testified that Danny was "excited" and "angry" at Lally. The incident also appears to have been a startling event, since the confrontation between Lally and Danny at the Mr. Hero's prompted Lally to call for police assistance. The incident, along with the appearance of a police officer at the scene, makes it more probable that the statements were excited utterances in response to a startling event before there was time for the nervous excitement in the declarant to lose domination over his reflective faculties. See *State v. Huertas* (1990), 51 Ohio St.3d 22, 31, 553 N.E.2d 1058, 1068; *State v. Simko* (1994), 71 Ohio St.3d 483, 490, 644 N.E.2d 345, 352.

**{¶ 50}** Appellant next argues that Danny's out-of-court statements to Lally's fiancée, Sandra Williams, were hearsay. Over defense objections, Williams testified that Danny told her that Lally would feel "real bad" if anything happened to her or to any members of Lally's family. Danny also told Williams he knew where Lally's parents lived and that it would be a shame if their trailer happened to get blown up. The state contends that the statements were made by Danny in furtherance of a conspiracy under Evid.R. 801(D)(2). The state argues that these statements by co-defendant Danny Smith were relevant to show that he, appellant, and Jalowiec participated in a conspiracy to silence Lally through intimidation, and eventually murder.

**{¶ 51}** In our view, these statements were not hearsay, because they were not offered to prove the truth of the matter asserted (*i.e.* – that Lally would feel bad,

that he knew where Lally's parents lived, that it would be a shame, *etc.*). However, even if we were to assume that such statements were arguably hearsay, under Evid.R. 801(D)(2) hearsay does not include "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy." This court recognized in *State v. Carter* (1995), 72 Ohio St.3d 545, 651 N.E.2d 965, paragraph three of the syllabus, that "[t]he statement of a co-conspirator is not admissible pursuant to Evid.R. 801(D)(2)(e) until the proponent of the statement has made a prima facie showing of the existence of the conspiracy by independent proof." See, also, *State v. Milo* (1982), 6 Ohio App.3d 19, 6 OBR 44, 451 N.E.2d 1253.

{¶ 52} Prior to Sandra Williams's testimony, Sharon Hopkins testified that appellant and Michael were dropped off near the railroad tracks on the morning of the murder, and that shortly thereafter a LeBaron convertible went over to where appellant and Michael were. Sharon saw four people in the LeBaron but could identify only Jalowiec. Danny told her to ask if his brother had been picked up. Later, she learned from her brother Terry that Lally had been killed.

{¶ 53} This independent proof of a conspiracy was insufficient to establish a prima-facie case at the time Williams testified. However, independent proof of the conspiracy among appellant, Danny, Michael, and Jalowiec was admitted into evidence before the case was submitted to the jury. Compelling independent evidence during trial established that Danny approached Terry about killing somebody a few months prior to the murder. Officer Homoki testified about Danny's threats to Lally shortly after Danny and appellant had been arrested as a result of Lally's controlled drug buy from them. On the morning of the murder, Terry saw Danny, and Danny told him "they did it." Later that day, appellant, Danny, Michael, and Jalowiec were at Danny's apartment bragging about how they shot the victim, ran over him with the car, stabbed him, and stepped on him. Jalowiec said that "they had killed the guy." Audiotapes and transcripts of

15

appellant's statements to the police were admitted into evidence. These statements put appellant with Lally together and at the cemetery on the night and morning Lally was killed, and showed that Jalowiec was also involved. The DNA results showed that Lally's blood was found on the trunk liner of the LeBaron convertible. Michael's eyewitness deposition detailed the events both before and during the murder of Lally by appellant and Jalowiec. Hence, as in *Carter, supra*, 72 Ohio St.3d at 550, 651 N.E.2d at 972, the premature introduction of Danny's statements was harmless error.

**{¶ 54}** Last, the out-of-court statements of Danny to Terry Hopkins are cited by appellant as also constituting inadmissible hearsay. Yet Danny's statement to Hopkins that he was sick appears to qualify as a statement of Danny's then-existing mental, emotional, or physical condition under Evid.R. 803(3). In addition, Danny's statement that "they did it" could be categorized as an excited utterance under Evid.R. 803(2), since Hopkins described Danny as being "nervous" and "bothered" when he talked with him shortly after the murder. See *Huertas, supra*, 51 Ohio St.3d at 31, 553 N.E.2d at 1068; *Simko, supra*, 71 Ohio St.3d at 490, 644 N.E.2d at 352. The admission of Terry Hopkins's testimony about the other out-of-court statements made by the co-conspirators bragging about the murder at Danny's apartment also appears to be harmless error as to the timing of its admissibility and in light of the abundant evidence of appellant's guilt. *Carter, supra*. Accordingly, we overrule appellant's first proposition.

*Venue*

{¶ 55} In his fifth proposition of law, appellant asserts that the state failed to prove that he purposely murdered Lally with prior calculation and design by any act that occurred in Lorain County. Appellant submits that any and all conduct attributable to him in the Lally murder took place in Cuyahoga County and that therefore his conviction must be reversed.

{¶ 56} As we held in *Beuke, supra*, at paragraph one of the syllabus: "When an offender commits offenses in different jurisdictions as part of a course of criminal conduct, venue lies for all the offenses in any jurisdiction in which the offender committed one of the offenses or any element thereof. (R.C. 2901.12[H].)" Venue is not a material element of any crime, but is a fact that must be proven beyond a reasonable doubt. *State v. Headley* (1983), 6 Ohio St.3d 475, 477, 6 OBR 526, 528, 453 N.E.2d 716, 718. However, former R.C. 2901.12(G) provided: "When it appears beyond a reasonable doubt that an offense or any element of an offense was committed in any of two or more jurisdictions, *but it cannot reasonably be determined in which jurisdiction the offense or element was committed, the offender may be tried in any such jurisdiction*." (Emphasis added.)

{¶ 57} The state contends that prior calculation and design were proven to have occurred in Lorain County. The testimony concerning the threats made to Lally by Danny and the events leading up to when Lally was taken out of Lorain County in the LeBaron convertible with Jalowiec, appellant, and Michael tended to show a conspiracy preceding the murder. By inference, this series of events seems to have been orchestrated, and tends to support the state's theory that conspiracy and prior calculation and design occurred in Lorain County.

{¶ 58} In addition, Michael Smith testified that after they drove away in the LeBaron from Middle Avenue in Elyria, "[a]ppellant brandished a pistol on Ron Lally and told him, 'Don't make no stupid moves.' " They then stopped for gas at the Speedway on St. Rt. 254, "North Ridge," before they got on St. Rt. 2 headed to

Cleveland. That part of the deposition appears to describe events that took place in Lorain County.

{¶ 59} However, Michael's deposition also indicated that while they were driving along to Cleveland, "[e]very thing was a lot smoother" after Lally agreed to get on a Greyhound bus and leave town. Subsequently, they drove to East Cleveland and then rode around Cleveland until they ended up in the Woodland Cemetery in Cleveland. This evidence tends somewhat to negate the state's argument that prior calculation and design was formulated in Lorain County.

{¶ 60} Nevertheless, given the clear language of R.C. 2901.12(G), venue was proper in Lorain County. In our view, it is clear that the whole sequence of events culminating in Lally's murder occurred in two counties. In essence, appellant is arguing that the evidence was insufficient to support venue in Lorain County. In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

{¶ 61} Here, the jury could reasonably find that prior calculation and design took place in Lorain County, and, as a result, venue in Lorain County was proper. While venue is not a material element of the crime, there was ample and sufficient evidence for the jury to reasonably conclude that getting Lally in the car to ride with appellant and Jalowiec to Cleveland to buy crack, as well as the plan to have Lally take a bus out of town, was merely a ruse to kill him in an area where his corpse could not be identified. In addition, we find that the trial court did not err in

denying appellant's Crim.R. 29 motion for acquittal on grounds of improper venue, even though that ground was not specifically averred in the Crim.R. 29 motion. Accordingly, for these reasons, we overrule Smith's fifth proposition.

*Proof of the Death Specification*

{¶ 62} In his ninth proposition of law, appellant argues that he was prejudiced by extensive testimony given by Detective Leiby concerning the "underlying" criminal proceeding wherein appellant and Danny were set up by Lally in a controlled drug buy. Appellant contends that this error was magnified by the court's failure to give a limiting instruction concerning Leiby's testimony.

{¶ 63} Appellant failed to raise this issue before the court of appeals. Therefore, it is waived. *Williams, supra*, at paragraph two of the syllabus. Even if the issue were properly before this court, it would not compel reversal. Leiby's testimony as to the underlying offense was necessary to show that Lally was murdered to prevent his testimony against both appellant and Danny in the underlying drug trafficking cases. Thus, it was relevant to prove and support the death penalty specification of R.C. 2929.04(A)(8). See *State v. Coleman* (1999), 85 Ohio St.3d 129, 140, 707 N.E.2d 476, 487.

{¶ 64} Appellant cites two cases, *State v. Allen* (1987), 29 Ohio St.3d 53, 29 OBR 436, 506 N.E.2d 199, and *State v. Wright* (1990), 48 Ohio St.3d 5, 548 N.E.2d 923, that are either inapposite or readily distinguishable from this case. In addition, absent a request, the trial court was under no duty to provide a limiting instruction as to what parts of Leiby's testimony the jury should consider. Appellant's ninth proposition lacks merit and is overruled.

SENTENCING ISSUES

*Jury Instructions*

**{¶ 65}** In his sixth proposition of law, appellant asserts that the trial judge erred in charging the jury at the penalty phase as follows: (a) giving an improper instruction under *State v. Brooks* (1996), 75 Ohio St.3d 148, 661 N.E.2d 1030; (b) referring to aggravating circumstances (plural) when there was only one aggravating circumstance; (c) not defining what a mitigating factor is; and (d) listing all the statutory mitigating factors. Appellant's failure to object to any of these instructions waived all but plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus.

**{¶ 66}** Appellant first complains that the court erred in failing to instruct the jury pursuant to *Brooks, supra*. However, the instant case was tried in late 1995 before *Brooks* was decided. Moreover, the court instructed the jury as follows:

"You shall recommend the sentence of death if you unanimously, that is, all twelve of you, find by proof beyond a reasonable doubt, that the aggravating circumstances outweigh the mitigating factors.

"If you do not so find, you shall unanimously (all twelve) recommend either a life sentence with parole eligibility after serving twenty years of imprisonment, or a life sentence with parole eligibility after serving thirty years of imprisonment."

**{¶ 67}** No plain error occurred with this instruction. See *State v. Bey* (1999), 85 Ohio St.3d 487, 498, 709 N.E.2d 484, 496; *State v. Goff* (1998), 82 Ohio St.3d 123, 128, 694 N.E.2d 916, 921; *State v. Mitts* (1998), 81 Ohio St.3d 223, 233, 690 N.E.2d 522, 530-531. Here, unlike *Brooks*, 75 Ohio St.3d at 159, 661 N.E.2d at 1040, the jury was **not** told that it had "to determine unanimously that the death penalty is inappropriate before you can consider a life sentence." Instead, "[t]he jury was free to consider a life sentence even if jurors had not unanimously rejected the death penalty." *State v. Taylor* (1997), 78 Ohio St.3d 15, 29, 676 N.E.2d 82, 95.

**{¶ 68}** Appellant's complaint that the court erred in referring to aggravating circumstances in the plural is correct, but not a ground for reversal. While the court referred to the single aggravating circumstance as "circumstances," the mistake was non-prejudicial. See *State v. Jells* (1990), 53 Ohio St.3d 22, 33-34, 559 N.E.2d 464, 475. Moreover, the verdict form returned by the jury indicates that it considered only the single, aggravating circumstance that it found appellant guilty of during the trial phase.

**{¶ 69}** Appellant is also correct in noting that the court erred in instructing the jury on all statutory mitigating factors, even though the evidence presented did not compel such an exhaustive instruction. See *State v. Hicks* (1989), 43 Ohio St.3d 72, 77, 538 N.E.2d 1030, 1036, at fn. 3; *State v. DePew* (1988), 38 Ohio St.3d 275, 289, 528 N.E.2d 542, 557. However, this did not constitute plain error. See *Bey, supra*, 85 Ohio St.3d at 498, 709 N.E.2d at 496; *State v. Keith* (1997), 79 Ohio St.3d 514, 533, 684 N.E.2d 47, 65.

**{¶ 70}** In addition, appellant was not prejudiced by the court's failure to define the term "mitigating factor." While the trial court should define "mitigation" for the jury, the absence of instructions on the concept of mitigation does not violate the Eighth and Fourteenth Amendments to the United States Constitution. *Buchanan v. Angelone* (1998), 522 U.S. 269, ___, 118 S.Ct. 757, 761-762, 139 L.Ed.2d 702, 711. The instructions here did not foreclose the jury's consideration of any mitigating evidence because the court directed the jury to "consider all of the evidence." *Id.,* 522 U.S. at ___, 118 S.Ct. at 762, 139 L.Ed.2d at 710; *Goff, supra*, 82 Ohio St.3d at 131, 694 N.E.2d at 923. Appellant's bald assertion that the lack of such an instruction resulted in having the jury consider non-statutory aggravating circumstances is purely speculative.

**{¶ 71}** Last, appellant's contention that use of the term "recommendation" in the jury charge deprived him of a fair trial is not persuasive. Use of the term "recommendation" accurately reflects Ohio law and does not diminish the jury's

overall sense of responsibility. *State v. Henderson* (1988), 39 Ohio St.3d 24, 29-30, 528 N.E.2d 1237, 1243; *State v. Woodard* (1993), 68 Ohio St.3d 70, 77, 623 N.E.2d 75, 80-81. Moreover, the court specifically cautioned the jury that its use of the term "recommend" should not diminish their responsibility or lessen their task. Accordingly, we overrule appellant's sixth proposition.

*Sentencing Opinion*

{¶ 72} In his eighth proposition of law, appellant claims prejudicial error in the trial court's failure to comply with R.C. 2929.03(F), and in its failure to state its specific findings as to the existence of mitigating factors set forth in R.C. 2929.04(B). Appellant asserts that the court merely filed a document entitled "Judgment Entry of Conviction and Sentence." Appellant's assertion is incorrect, and at oral argument, defense counsel conceded that the trial court complied with all of the requirements of R.C. 2929.03(F) on February 2, 1996. Accordingly, appellant's eighth proposition is summarily overruled.

EFFECTIVE ASSISTANCE

{¶ 73} In his seventh proposition of law, appellant lists eight areas where he claims that trial counsel was ineffective. Reversal of a conviction for ineffective assistance requires that the defendant show, first, "that counsel's performance was deficient" and, second, "that the deficient performance prejudiced the defense * * * so as to deprive the defendant of a fair trial." *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693; accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373. However, in no instance does appellant demonstrate prejudice, "a reasonable probability that, were it not for counsel's errors, the results of the trial would have been different." *Bradley, supra*, at paragraph three of the syllabus.

{¶ 74} Appellant first complains that trial counsel failed to engage in meaningful voir dire. Specifically, appellant alleges that counsel failed to ask even one question of prospective juror Ellingsworth, and that counsel failed to object to

improper questions on two occasions. Appellant further complains that trial counsel's line of questioning consisted merely of general inquiries. However, none of appellant's claims amounts to ineffective assistance.

{¶ 75} A review of the voir dire of Ellingsworth indicates that she would not and could not impose a death sentence. Any attempt by defense counsel to rehabilitate Ellingsworth would have probably been a waste of time. Counsel was wise to concentrate rehabilitative efforts on other prospective jurors who were more open-minded.

{¶ 76} The two instances cited where counsel failed to object to improper questions do not indicate prejudice to appellant. In fact, the first instance cited by appellant involved questions from defense counsel, not the prosecutor. The second instance cited as an improper question did not prejudice appellant, since that prospective juror (Gosselin) was going to be excused for cause based on her inconsistent answers during voir dire. Nor did defense counsel's line of questioning amount to ineffective assistance. "The conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked." *State v. Evans* (1992), 63 Ohio St.3d 231, 247, 586 N.E.2d 1042, 1056. Examination of the entire voir dire indicates no deficient performance on the part of defense counsel.

{¶ 77} Appellant next asserts that defense counsel failed to object to numerous instances of prosecutorial misconduct, including prejudicial remarks in opening and closing argument. The first instance, where the prosecutor stated, "Now, as a result of the fact that this group of people [the co-defendants] had been known to kill all those that are testifying against them * * *," should have been objected to, but did not prejudice appellant. The comment was overly embellished, but retained a grain of truth in that all the co-defendants were charged with killing Lally to prevent his testimony in another proceeding. The prosecutorial comments

in closing argument appear to be a proper rebuttal to defense counsel's characterization of testimony that took place during trial.

{¶ 78} Defense counsel also failed to object during the prosecutor's questioning of mitigation witnesses. However, we find neither deficient representation nor prejudice. While the prosecutor's questions were sharp and overly persistent, none rose to the level of misconduct that would have necessitated numerous objections. Counsel's decision not to interrupt in these contexts reflected an "objective standard of reasonable representation." *Bradley, supra*, at paragraph two of the syllabus.

{¶ 79} Appellant's complaint that counsel failed to object to an alleged *Brooks* violation is not well taken. As discussed under appellant's sixth proposition of law, the instruction was given before this court announced its decision in *State v. Brooks*. In addition, the instruction that was given did not constitute reversible error. See, *e.g., Taylor, supra*, 78 Ohio St.3d at 29, 676 N.E.2d at 95-96.

{¶ 80} Similarly, counsel's failure to object to detective Leiby's testimony of the "underlying offense" did not prejudice appellant. As discussed under appellant's ninth proposition of law, Leiby's testimony was relevant and probative of appellant's motive in committing the crime and in proving the death penalty specification.

{¶ 81} Appellant asserts that he was prejudiced by counsel's failure to object (1) to Leiby's testimony concerning appellant's alleged "kill" remark at the end of Michael's deposition, and (2) to Deputy Drozdowski's rebuttal testimony. Neither assertion is persuasive. Counsel appears to have refrained from objecting in order to present a witness who discounted Leiby's (and later Drozdowski's) testimony that appellant threatened to kill Michael at the close of his deposition. Such a trial strategy, even if questionable, does not compel a finding of ineffective assistance of counsel. See *State v. Clayton* (1980), 62 Ohio St.2d 45, 49, 16 O.O.3d 35, 37, 402 N.E.2d 1189, 1192.

**{¶ 82}** Counsel's failure to recall Leiby for further questioning concerning a conversation he had with Michael Smith while the trial was ongoing did not constitute ineffective assistance. The court had already conducted a hearing concerning the availability of Michael as an in-court witness, and the court declared that it would require Michael's appearance if he was found. A request for a continuance would not have been granted, since the trial court was aware of the phone conversation between Leiby and Michael, and was aware that Michael was out of state and was hesitant to come back to Ohio because of pending arrest warrants for his probation violations.

**{¶ 83}** Nor was counsel ineffective for failing to ensure that appellant's prior convictions were not disclosed to the jury. The death penalty specification alleged that appellant killed a witness to prevent his testimony at another criminal proceeding. The court file for that proceeding was a necessary piece of evidence to prove the death penalty specification. Within the file was information that appellant had several prior convictions. However counsel, as part of his trial strategy, used the knowledge of appellant's prior convictions to argue that appellant may have been involved with drugs, but he was not a murderer. As we held in *Clayton, supra*, 62 Ohio St.2d at 49, 16 O.O.3d at 37-38, 402 N.E.2d at 1192, even if such strategy was questionable, deference to counsel's judgment is appropriate.

**{¶ 84}** Last, appellant's claim that counsel was ineffective for failing to ask the trial judge to recuse himself is not persuasive. Moreover, the issue was waived, since appellant never raised it before the court of appeals. *Williams, supra*, at paragraph two of the syllabus. Even if the issue was properly before us, prejudice to appellant is lacking. Appellant claims that the record indicates that the trial judge, Judge Glavas, granted shock probation to a key state's witness, Terry Hopkins. The trial judge was vigilant in assuring appellant a fair trial, however, and nothing in the record suggests that he was laboring under any "blatant conflict of interest," as appellant contends.

{¶ 85} Appellant's claims of ineffective assistance of trial counsel are not well taken. His seventh proposition is overruled.

PROSECUTORIAL MISCONDUCT

{¶ 86} In his fourth proposition of law, appellant argues that assistant prosecutor Rosenbaum committed numerous acts of misconduct at every stage of the trial and that these acts compel reversal of his conviction and death sentence.

{¶ 87} The test for prosecutorial misconduct is whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 318, 470 N.E.2d 883, 885. The touchstone of analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78, 87.

{¶ 88} Appellant first claims that the prosecutor "embarked on an attack towards jurors who showed even the slightest predisposition against the 'knee jerk' imposition of the death penalty." However, the voir-dire transcript does not support appellant's assertion. Appellant states that this argument "is fully discussed in a separate proposition of law." Yet, examination of the arguments raised under his third proposition of law lend no credence to appellant's assertion that the prosecutor "embarked on an attack" against open-minded prospective jurors.

{¶ 89} Appellant also cites comments made during the opening statement and closing arguments of the trial phase: "this group of people had been known to kill all those that are testifying against them"; and "with the car that they chose to use, as they used in the past to commit crimes."

{¶ 90} No objection was made to the first comment. As discussed under appellant's seventh proposition of law, the comment was embellished but not totally misleading in light of the prosecution's theory of the case that the co-defendants killed Lally to prevent his testimony at another trial. Any error was not

outcome-determinative. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804.

{¶ 91} Appellant objected to the second comment and that objection was sustained. Appellant asserts that misconduct took place when the prosecutor then stated: "Well, I think the testimony will reflect and you can conclude on your own that they borrowed the car in the past to sell crack cocaine." This second assertion was also objected to, and appears to be an embellishment of the fact that Fike admitted that she let Danny use her car in exchange for drugs. Even assuming error, any error did not materially prejudice appellant.

{¶ 92} Appellant next cites comments by the prosecutor during closing argument: "[T]hese pictures document their handywork [*sic*] and speak for what kind of people they are"; "You may know now why Mr. Bruner [defense counsel] says what he says is not evidence"; "He is doing what I cautioned you about. He is trying to direct your attention to somewhere else to what the evidence might be, what it could be, what he says that is, when it is not what happened from the stand." None of these comments was objected to, thus waiving all but plain error. *State v. Slagle* (1992), 65 Ohio St.3d 597, 604, 605 N.E.2d 916, 924-925. Nor do these comments constitute plain error. See *Long, supra*. The prosecution is entitled to a certain degree of latitude in summation. *State v. Liberatore* (1982), 69 Ohio St.2d 583, 589, 23 O.O.3d 489, 493, 433 N.E.2d 561, 566. The comment concerning the photos could be characterized as the expression of personal opinion, but such a comment is not improper if it is based on the evidence presented at trial. *State v. Tyler* (1990), 50 Ohio St.3d 24, 41, 553 N.E.2d 576, 595-596. Unlike the situation in *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 357, 662 N.E.2d 311, 322, the prosecutor does not appear to have been asking the jury to imagine what the victim was thinking, nor inviting the jury to speculate on facts not in evidence. Although somewhat theatrical, the second and third comments do not improperly denigrate

defense counsel. Cf. *State v. Clemons* (1998), 82 Ohio St.3d 438, 453-454, 696 N.E.2d 1009, 1023.

{¶ 93} Appellant next complains that the prosecutor's questioning of mitigation witness William Hill went far beyond the scope of fair play. Unquestionably, the prosecutor's cross-examination of Hill was rough. Yet this line of cross-examination, although brash and theatrical, was neither improper nor unfair. Hill invited the questioning in the first instance when after mentioning his prior problems with drug abuse, he asked the prosecutor: "Does that make me a killer?" The prosecutorial question to Hill: "So you are asking them to violate their oath of office?" was objected to and sustained by the trial court. Appellant omits mentioning this fact. The question to Hill as to what mitigating evidence he has to offer was not improper. In fact, it gave Hill the opportunity to explain why he believed the jury should spare appellant's life.

{¶ 94} The reference to appellant as a "drug pushing murderer" during Kim Hill's mitigation testimony was made in the form of a question. Kim Hill responded: "That is not all he [appellant] is." While the question was harsh, it was not improper given the fact that appellant was found guilty of murder. Moreover, it was arguably within the creative latitude accorded both parties, and not "purely abusive." *State v. Brown* (1988), 38 Ohio St.3d 305, 317, 528 N.E.2d 523, 538.

{¶ 95} Appellant next alleges prosecutorial misconduct during closing argument at the mitigation phase. First, appellant contends that the prosecutor referred to the nature and circumstances of the offense as "aggravating circumstances." However, close examination of the prosecutor's argument does not reveal that he was arguing that the nature and circumstances of the offense were aggravating circumstances, as proscribed in *Wogenstahl, supra*, at paragraph two of the syllabus. Instead, the prosecutor's recitation of the nature and circumstances of the crime was interwoven with his argument that they lacked mitigating value: "I submit to you that this was not the unfortunate act of someone that was dazed on

crack cocaine"; "He might have been [a] nice person 20 years ago * * * but even if he is, it does not outweigh what he did"; "I don't care how much crack cocaine he uses, that is not mitigation to offset this horrendous type of killing"; "That is the mitigation that he puts before you and it cannot outweigh the conscientious decision to assassinate another human being. That speaks louder than any of the little conscientious things in the past."

{¶ 96} These types of comments by prosecutors are permissible. See *State v. Grant* (1993), 67 Ohio St.3d 465, 482, 620 N.E.2d 50, 68-69. In addition, prosecutors may legitimately refer to the nature and circumstances of the offense, both to refute any suggestion that they are mitigating and to explain why the specified aggravating circumstance outweighs the mitigating factors. *State v. Sheppard* (1998), 84 Ohio St.3d 230, 238, 703 N.E.2d 286, 294. Prosecutors can urge the merits of their cause and legitimately argue that defense mitigation is worthy of little or no weight. *State v. Wilson* (1996), 74 Ohio St.3d 381, 399, 659 N.E.2d 292, 309. While the last comment misstated the weighing process during the mitigation phase, no objection was raised, and the trial court gave correct instructions on the proper standard to apply in the weighing process. Any error in this vein was harmless. *State v. Greer* (1988), 39 Ohio St.3d 236, 250-251, 530 N.E.2d 382, 399-400. Moreover, nowhere did the prosecutor imply, refer, or allude to the nature and circumstances of the crime as "aggravating circumstances." Cf. *Wogenstahl, supra*, 75 Ohio St.3d at 357-361, 662 N.E.2d at 322-325.

{¶ 97} Appellant also argues that the prosecutor argued on matters outside the record when he stated: "The State took his [Michael Smith's] deposition so that the motive to kill him would not exist. In other words, it is admissible even if he were to be killed. Is it so surprising that he is not here? He knows his father. He saw what he can do and he is gone." No objection was raised to these comments. Moreover, these comments appear to be a proper rebuttal to defense counsel's assertion that "[o]ne of the main witnesses was not here for me, as his lawyer, to

cross-examine at trial, not at a deposition." The prosecutor's comments appear to be reasonable inferences based on the evidence in the record.

{¶ 98} Next, appellant contends that the prosecutor improperly commented on the fact that his unsworn statement "was cross-examined by no one." This claim is also without merit. In *State v. Davis* (1996), 76 Ohio St.3d 107, 119-120, 666 N.E.2d 1099, 1110, we found that prosecutorial comment on the lack of cross-examination on a defendant's unsworn statement was "consistent with [*State v.*] *DePew* [(1988), 38 Ohio St.3d 275, 528 N.E.2d 542]." Accord *State v. Moore* (1998), 81 Ohio St.3d 22, 34, 689 N.E.2d 1, 13.

{¶ 99} The defense attempts to persuade us to find pervasive prosecutorial misconduct in this case based largely on generalities and a few specific examples. Nevertheless, none of the instances cited by appellant, either individually or collectively, amounts to prosecutorial misconduct. Appellant received a fair trial, and his substantial rights were not prejudiced by the remarks of the prosecutor. There are no similarities between what occurred in this case and what occurred in *State v. Keenan* (1993), 66 Ohio St.3d 402, 613 N.E.2d 203, or *State v. Fears* (1999), 86 Ohio St.3d 329, 715 N.E.2d 136. Therefore, we overrule appellant's fourth proposition.

## CONSTITUTIONALITY

{¶ 100} In his eleventh proposition of law, appellant contends that Ohio's death penalty laws are unconstitutional under various provisions, both facially and as applied. However, these arguments lack merit. See, *e.g., Jenkins, supra*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264; *State v. Esparza* (1988), 39 Ohio St.3d 8, 529 N.E.2d 192; *Henderson, supra,* 39 Ohio St.3d 24, 528 N.E.2d 1237; *State v. Zuern* (1987), 32 Ohio St.3d 56, 512 N.E.2d 585; *State v. Phillips* (1995), 74 Ohio St.3d 72, 103-104, 656 N.E.2d 643, 670-671; and *Goff, supra*, 82 Ohio St.3d at 141, 694 N.E.2d at 930. Therefore, we summarily reject these claims, and

overrule appellant's eleventh proposition. *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

## INDEPENDENT REVIEW AND PROPORTIONALITY

{¶ 101} In his tenth proposition of law, appellant asserts that his death sentence is inappropriate and must be vacated because the aggravating circumstance does not outweigh the mitigating factors present in this case. However, appellant's arguments are not well taken, and his tenth proposition is overruled.

{¶ 102} While much of the state's evidence was circumstantial and based on reasonable inferences derived from direct evidence, the deposition of Michael Smith was the key piece of evidence that solidified the state's case. The threats to Lally and his fiancée, the testimony that Danny Smith was looking to hire a "hit man," the range of testimony concerning the events leading up to the murder, including the tape of appellant in which he attempted to portray himself as a self-defending victim to a gun-wielding Lally, all combine to prove the single aggravating circumstance beyond a reasonable doubt. After independent assessment, we find that the evidence supports beyond a reasonable doubt the aggravating circumstance that appellant killed Lally in order to prevent him from testifying as a witness at his trial for drug trafficking. R.C. 2929.04(A)(8).

{¶ 103} The nature and circumstances of the offense provide nothing in mitigation. The fact that the murderers and victim were smoking crack cocaine before the murder does not mitigate the offense: "[T]he unlawful taking of a human life cannot be deemed less serious simply because the victim was involved in unlawful activity." *State v. Williams* (1997), 79 Ohio St.3d 1, 18, 679 N.E.2d 646, 661. Nor does the fact that Jalowiec also participated in the murder of Lally have any weight in mitigation.

{¶ 104} Appellant's history, character, and background provide some mitigating features. Several witnesses testified on appellant's behalf, including two

cousins and an uncle. All four witnesses acknowledged appellant's problems with drug abuse. Appellant's cousin, Sandra Howard, described appellant as a decent father and family member, and further stated that appellant was not the cruel and calculated person the media had portrayed him to be. Appellant's uncle, Derrick Smith, was raised along with appellant during their childhood and spent time with him when he caddied at the Elyria Country Club. Derrick also worked at several jobs with appellant at National Tube and the U.S. Steel mill. He never knew appellant to be violent, even though he knew appellant was convicted of robbery "back in the 50s."

{¶ 105} William Hill, another cousin of appellant, testified that he looked up to appellant while growing up and that he helped appellant seek drug treatment in 1993. Hill stated that drugs changed appellant, who was once a hard-working individual who brought himself up from the streets to work at the Ford Assembly Plant in Lorain. In Hill's opinion, appellant had a difficult time facing his drug problem, and Hill believes that appellant is ashamed that he let his friends and family down. Hill asked the jury to spare appellant and sentence him to life in prison in the hope that he can help some individual deal with their problems, as Hill had tried to help appellant.

{¶ 106} Hill's wife, Kim Hill, also testified on appellant's behalf. She stated that appellant took her under his wing when she was only fourteen years old and hanging out at bars. Appellant showed her kindness and offered her an outlet away from people who would be using and exploiting a fourteen year old. She and her husband also helped get appellant into drug treatment. She expressed the feeling that appellant "was a compassionate man at one time."

{¶ 107} Appellant gave an unsworn statement wherein he denied killing Lally. He described the prosecution's witnesses as "crackheads," and felt his rights were violated since the murder was not proven beyond a reasonable doubt. He further claimed that Detective Leiby was going to "get" him because he would not

32

testify as Leiby wanted him to testify. Appellant also expressed condolences to Lally's family, but declared: "[W]e don't know nothing about this murder."

{¶ 108} With regard to the statutory mitigating factors of R.C. 2929.04(B), appellant claims that he was not the principal offender, R.C. 2929.04(B)(6), but the evidence indicates that both he and Jalowiec were the actual killers of Lally. Nor does it appear that the victim induced the offense, R.C. 2929.04(B)(1), in a manner that would be considered mitigating. The killing of a witness to prevent his testimony in another criminal proceeding strikes at the heart of the criminal justice system. See *State v. Keene* (1998), 81 Ohio St.3d 646, 671, 693 N.E.2d 246, 266-267; *Coleman, supra,* 85 Ohio St.3d at 145, 707 N.E.2d at 491. In addition, the fact that the killers and victim were smoking crack cocaine prior to the murder does not qualify the offender as being under duress, coercion, or strong provocation. R.C. 2929.04(B)(2).

{¶ 109} However, several aspects in appellant's background are entitled to some weight under R.C. 2929.04(B)(7). His drug problem is entitled to minimal weight. See, *e.g., State v. Hill* (1995), 73 Ohio St.3d 433, 447-448, 653 N.E.2d 271, 284. Also mitigating is the love and support that appellant enjoys from some family members. See, *e.g., State v. Mason* (1998), 82 Ohio St.3d 144, 170, 694 N.E.2d 932, 957. One could also give slight mitigating value to the fact that appellant tried to address his drug abuse problem. While the jury was instructed on residual doubt, it is not an acceptable mitigating factor under R.C. 2929.04(B). *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112, syllabus.

{¶ 110} Upon independent weighing, the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt.

{¶ 111} We further find that the death penalty imposed in this case is both appropriate and proportionate with the sentence given in *Coleman, supra*, 85 Ohio St.3d 129, 707 N.E.2d 476, which also involved the single specification of murdering a witness to prevent the witness from testifying in a criminal proceeding.

The mitigating factors presented in *Coleman* are comparable to those raised in this case. The sentence is also appropriate and proportionate to the sentence imposed in cases with capital specifications in addition to the R.C. 2929.04(A)(8) specification. See, *e.g., State v. Lawson* (1992), 64 Ohio St.3d 336, 595 N.E.2d 902; *State v. Hooks* (1988), 39 Ohio St.3d 67, 529 N.E.2d 429.

{¶ 112} Based on all of the foregoing, we affirm appellant's conviction and death sentence.

*Judgment accordingly.*

MOYER, C.J., DOUGLAS, F.E. SWEENEY, COOK and LUNDBERG STRATTON, JJ., concur.

PFEIFER, J., concurs separately.

_____

**PFEIFER, J., concurring.**

{¶ 113} All the principal events in this case occurred in Cuyahoga County; the only thing that didn't was the act of prior calculation and design. Why then was the case tried in Lorain County? Because Ronald Lally was an important witness in a case Lorain County was prosecuting and was killed by appellant to assure his silence. I understand Lorain County's interest; however, it appears a rather slim interest when weighed against the chance that an aggravated murder conviction could have been overturned based on lack of venue.

_____