In this consolidated appeal defendants-appellants Vincent Shaw and Sylvia Cheney-Shaw appeal from convictions on various counts of felonious assault, child endangering and intimidation as entered against them in Cuyahoga County Court of Common Pleas after trial to the bench. Appellants claim, inter alia, that the evidence adduced at trial was insufficient to support their convictions; that Shaw's conviction for intimidation was against the manifest weight of the evidence; and that Shaw's conviction violated his right to be free from double jeopardy. Further, appellant Sylvia Cheney-Shaw challenges as improper the sentences imposed on her convictions on counts thirty to forty. We find no reversible error in appellants' convictions and affirm. However, because we find that the trial court erred in the imposition of sentence upon appellant Sylvia Cheney-Shaw as to her convictions on counts thirty to forty, we vacate her sentence in part and remand Case No. CR-366345 to the trial court for resentencing on these convictions pursuant the proper sentencing statute in effect at the time the acts were committed.
The record demonstrates that the named victim in this matter was DeAngelo Cheney (d.o.b 1/30/93), the natural son of Sylvia Cheney-Shaw and step-son of Vincent Shaw. DeAngelo is an autistic child with a seizure disorder who was removed from the custody of his mother and his step-father in September 1997, after he suffered injuries suspected by Cuyahoga County Department of Children and Family Services (CCDCFS) to have been the result of abuse. Subsequently, during the spring of 1998, mother and step-father were permitted unsupervised visitation periods with DeAngelo. In June 1998, DeAngelo was admitted to Rainbow Babies and Children's Hospital with life-threatening abdominal injuries.
Thereafter, on August 10, 1998, the Cuyahoga County Grand Jury issued multi-count indictments against appellants Sylvia Cheney-Shaw and Vincent Shaw stemming from allegations of their involvement in a series of injuries sustained by DeAngelo during his brief life. Sylvia Cheney-Shaw was charged in a forty-five count indictment with fourteen counts of felonious assault in violation of R.C. 2903.11; twenty-nine counts of child endangering in violation of R.C. 2919.22 and two counts of child abuse in violation of R.C. 2919.22. Vincent Shaw was charged in a sixteen-count indictment with four counts of felonious assault in violation of R.C. 2903.11, eleven counts of child endangering in violation of R.C. 2919.22 and one count of intimidation of a witness in violation of R.C. 2921.04. Each defendant-appellant pled not guilty to all charges and on June 7, 1999, after entry of jury waiver by each, the matter proceeded to a joint trial before the bench.
The state, in its case-in-chief, presented the testimony of seventeen medical, social service and law enforcement personnel who had been involved in the case of DeAngelo Cheney and of two witnesses who observed the Cheney-Shaw family interactions.
DeAngelo's pediatrician, Conleth Crotser, M.D. of St.Luke's Medical Center, testified that DeAngelo's records revealed that he had breathing problems at birth and remained hospitalized after mother checked herself out of the hospital. His hospital chart noted that when mother returned to visit the newborn she smelled of alcohol prompting a call for a social service consult. At his first check-up in February 1993, DeAngelo appeared to be normal and growing well; but in April, at his second visit, Dr. Crotser noted her concern that mother's comments and sad demeanor indicated a potential abuse situation prompting her to refer mother to Bellflower for parenting support and skills. Due to her concerns, she scheduled DeAngelo's next appointment for three months instead of the usual four. Mother missed appointments and failed to return until five months prompting Dr. Crotser to initiate a referral to 696-KIDS. In January 1994, she noted mother's affect was flat as mother reported that her boyfriend was in jail for raping her eight-year-old daughter. In July 1994, she noted that DeAngelo appeared to be growing better, he received his immunizations but was found to have an elevated lead level. Mother failed to return for a repeat blood test as scheduled. Then, on February 23, 1995 at his two-year check-up, Dr. Crotser observed ten healed burn marks on DeAngelo's back and limbs which indicated abuse. When questioned, mother explained that DeAngelo had developed blisters in August, saying she took DeAngelo to Dr. Rodriguez and she treated the blisters with cocoa butter. However, Victorio Rodriguez, M.D. testified that although he treated DeAngelo on March 17, 1994, September 15, 1994 and January 27, 1995, each visit was related to complaints of a cough or cold. At these exams, Dr. Rodriguez checked DeAngelo's throat, nose, ears and checked his lungs using a stethoscope under the child's clothing. Dr. Rodriguez stated that he never viewed DeAngelo's torso nor received a complaint of blisters on DeAngelo's legs or arms.
Due to Dr. Crotser's concerns about the healed second-degree burns which appeared to have been inflicted with a curling iron, she took photographs of DeAngelo's injuries, discussed the suspected abuse with mother and submitted a report to 696-KIDS. Mother never returned DeAngelo to her care.
As a result of this complaint, on February 24, 1995, Darlene Smith, a CCDCFS social worker, was assigned to investigate. She attempted a home visit that day but was unsuccessful. Ms. Smith testified that she subsequently completed a home visit on March 21, 1995, during which mother explained that DeAngelo's blisters were a reaction to a shot which DeAngelo should not have received due to his elevated lead level. In April 1995, because mother's explanations were inconsistent with DeAngelo's injuries, Mary Ann Zitello, a family service social worker with CCDCFS, was assigned to provide case management services. Ms. Zitello testified that she received a phone call from Ms. Brown on March 20, 1996, who reported to her that DeAngelo had suffered another injury, so on March 21, Ms. Zitello met with mother. DeAngelo had a broken arm and mother explained that the this injury occurred either as a result of his jumping on the bed or by someone else causing the injury.
M. Wiznitzer, M.D., a pediatric neurologist at Rainbow Hospital, met DeAngelo in 1995 after he was admitted with prolonged seizures. He noted that DeAngelo's diagnosis of autism was made by Dr. Berenson in 1995. Dr. Wiznitzer generally described autism as a developmental disorder which manifests features during the second or third year of life demonstrating social disorders. He said that although autistic children can develop social skills, their communication can be significantly impaired in both verbal and non-verbal areas. Autistic children have restrictive interest and do not tolerate change well, but there is a lessening of impairment and improvement as the children get older. He stated that autism does not cause a child to be unsteady and noted that self-destructive behavior is extremely rare. Dr. Wiznitzer found that DeAngelo exhibits no falling or unsteadiness and concluded that the injuries incurred by DeAngelo are not common in children with autism. He stated that sixty to seventy percent of autistic children are retarded but thirty to forty percent are not. He testified that DeAngelo is functionally retarded. He stated that it is a well-known phenomenon that children with autism can have changes in their perception of various stimuli such as pain. He testified that DeAngelo takes medication to control his seizure activity and has suffered only one reported breakthrough seizure which only caused an impairment of his consciousness. He reported that DeAngelo has no chronic destructive behaviors and he concluded that because autistic children have visual spatial strength it makes sense that DeAngelo would react strongly to a photograph.
Johnny Williams of CCDCFS testified that on August 4, 1997, upon a complaint of abuse and neglect of DeAngelo, he was assigned to investigate the Cheney-Shaw family. That day, Mr. Williams went to the home but was told by appellant Shaw that mother and DeAngelo did not live there. He returned on August 5th but was again unsuccessful at seeing DeAngelo. Finally, on September 2, 1997, Mr. Williams saw DeAngelo who was then hospitalized at University Hospital with a swollen leg, bruised fingers, scratch marks and a blackened and swollen left eye. Mother explained to Williams that DeAngelo's swollen leg was the result of a lymph node problem, the scratches due to a puppy and bruised fingers due to his nail biting.
On September 8, 1997, Kimberly Salerno, CCDCFS social worker, conducted a home visit with the family because mother had failed to attend a staffing. She observed DeAngelo suffered from a swollen leg and various scratches. Mother claimed DeAngelo's leg was swollen from a muscle spasm, attributed his scratches and scars as having been inflicted either by a babysitter or a puppy and said his fingers were worn down from nail biting.
Then, about four p.m. on September 13, 1997, Bernice Bailey, a hotline social worker with Cuyahoga County Human Services Department, received a referral which reported that DeAngelo had been physically abused. Within the hour, she summoned the police and met with the police at the home. However, DeAngelo was not there. Mother and step-father Vincent reported that he was with Vincent's brother. The parents were unable to provide an address or phone number where Vincent's brother could be reached, but indicated that they would bring DeAngelo to the hotline upon his return. They complained that the allegations of abuse were false and they explained that DeAngelo had suffered a seizure at eleven p.m. the previous evening resulting in a bruise to his head for which they had taken him to the hospital. DeAngelo's maternal grandmother informed Ms. Bailey that DeAngelo was okay with no indication of abuse. Ms. Bailey returned at 9 p.m. to see DeAngelo but as no one answered the door, she was unsuccessful. The parents failed to bring DeAngelo into the hotline as they had promised. Ms. Bailey turned the case over to an active social worker.
The next day, September 14, Noreen Dlouhy, CCDCFS hotline worker, visited the Cheney-Shaw home at 7:30 p.m. on a re-contact because the initial contact was unsuccessful. Step-father told Ms. Dlouhy that DeAngelo and his mother did not live there.He explained that the report of abuse stemmed from an injury suffered by DeAngelo when he had a seizure and hit his face on the floor. Although he assured Ms. Dlouhy that mother would contact the hotline upon her return, mother failed to do so.
Johnny Williams, CCDCFS social worker, had attempted to see DeAngelo on September 13th after the hotline received the call, but he was unsuccessful. Finally, Mr. Williams observed DeAngelo on September 15, 1997, and noted he had a black eye, minimal movement in his arm and a swollen leg which caused him to limp. Mr. Williams took DeAngelo, accompanied by his mother, to the hospital. Based upon his observations and the doctor's report, Mr. Williams placed DeAngelo into temporary emergency custody of CCDCFS. Subsequently, DeAngelo was placed in a foster home.
G. Golonka, M.D., assistant professor of pediatrics at University Hospital, became DeAngelo's managing pediatrician and saw him three times after September 1997, twice for well-child care and once for a rash. DeAngelo came to his appointments accompanied by his foster mother and was observed to be a well-behaved child. Dr. Golonka noted upon review of the medical records that in August 1997, DeAngelo had been hospitalized for an undiagnosed chest mass; in September 1997, he had been hospitalized for a coalescing hematoma in his thigh; and in June 1998, he had been hospitalized for six months for intestinal perforation. While hospitalized, DeAngelo's behavior became defiant and difficult after he received phone calls from his family. He went into his worst behavioral period after the police showed him family photographs. Otherwise, DeAngelo demonstrated no self-destructive behaviors and had no balance or co-ordination difficulties. During his hospitalization, DeAngelo was seizure-free and had only one brief breakthrough seizure after which his medication was adjusted. Since his discharge from the hospital in December 1998, DeAngelo has not suffered any injury or trauma.
In February 1998, DuJuana Bates, CCDCFS social worker, was assigned to the case. She reviewed the case plan and conducted a home visit during which she explained her expectations and noted that step-father seemed resistant to the plan. She said both parents commented that DeAngelo did not feel pain like other children. In April 1998, bi-weekly home weekend visitations were introduced and, thereafter, weekly weekend visitations were permitted. Ms. Bates noted that in June DeAngelo was with his mother and step-father from the 12th to 15th and then from the 18th to either the 23rd or 24th on an extended visitation. Then, on June 26th, DeAngelo was admitted to the hospital with near fatal injuries. The hospital staff contacted Ms. Bates with concern that the day after surgery neither parent was present although the child might not live. She questioned the parents who indicated that they were required to be at work. The hospital staff had concerns regarding mother's behavior during her visit with DeAngelo and both his mother and step-father were permitted only supervised visitations during his hospitalization. Ms. Bates observed that DeAngelo's step-father was rude and belligerent; however, DeAngelo's grandmother was a soothing influence for him and was permitted unrestricted visitation. Ms. Bates testified that DeAngelo remained in foster care while the county sought permanent custody. She affirmed that DeAngelo has sustained no further injuries since June 1998.
In April 1998, Benetta Wells became DeAngelo's foster mother through Specialized Alternatives for Families and Youth (SAFY). She described DeAngelo as a mildly autistic, special needs child, who ate a lot and was loving and huggable. She said that DeAngelo had no trouble walking or running. He was not clumsy, he did not harm himself, and he never had a seizure while in her care. In June 1998, DeAngelo had an extended home visit from Thursday evening until the following Wednesday. On Thursday and Friday of that week DeAngelo was in her care and appeared fine. However, on Friday afternoon when she returned DeAngelo to his parent's house for the weekend, he screamed, hollered and refused to get out of the car requiring his mother to pull him out. Since that Friday, DeAngelo never returned to her care.
Demetrius Snoddy, a licensed social worker and family youth specialist with SAFY, was assigned to DeAngelo's basic care management, which included transporting him to the respite care provider, Sunbeam School and his home visitations. He reported that Ida Payne was DeAngelo's foster parent prior to Ms. Wells. He described DeAngelo as a happy, bubbly guy. However, DeAngelo was resistant to being dropped off at home. On three or four occasions he had to physically lift DeAngelo out of the car. Mr. Snoddy observed a bond between DeAngelo and his parents but concluded that it was not an affectionate one. However, DeAngelo loved to see his grandmother and ran to her. Mr. Snoddy testified that the last time he saw DeAngelo was June 12, 1998 when he was dropped off at home. Mr. Snoddy's supervisor, Myra Henderson, who was responsible for monitoring the placement of children, testified that with the approval of the county, DeAngelo had been in the care of his mother from June 18th through June 24th.
Raynill Lee, a Respite Care provider through SAFY, cared for DeAngelo daily, Monday through Friday, from April until June 1998. She said DeAngelo never was a problem, he was not clumsy, he did not bang his head, he did not hurt himself and he did not have seizures while in her care.
A. Stallion, M.D., pediatric surgeon and associate director of trauma at Rainbow Babies and Children's Hospital, first met DeAngelo on September 1, 1997, when he appeared in the emergency room with swelling in his right leg due to a blood clot secondary to trauma. Testing for blood disorders was performed but none were found. Dr. Stallion stated that this type of leg swelling is not a normal childhood type injury nor the type of injury which would be caused by a fall due to seizure, but occurs as the result of significant force. DeAngelo next was admitted to the hospital with abdominal pain and a swollen scrotum, critically ill with infectious shock. Dr. Stallion believed this injury was potentially fatal and caused by a sharp blow to DeAngelo's abdomen such as a punch or kick. He opined that such trauma could not be self-inflicted nor inflicted by another child. Upon examination which revealed acute and chronic inflammation, Dr. Stallion determined that the injury did not occur that day but could have been inflicted anywhere from eight to ten days or twenty-four to forty-eight hours prior to DeAngelo's admission. DeAngelo required the removal of fifty percent of his large intestine and was given a colostomy. Dr. Stallion concluded that both DeAngelo's leg injury and intestinal injury were sustained secondary to significant force.
Detective Karl Lessmann and his partner Patricia Coleman of the Cleveland Police Department Sex Crime and Child Abuse Unit investigated the infliction of DeAngelo's injuries. Det. Lessman testified that on July 1, 1998, mother and step-father were interviewed in the security services office at University Hospital. Each denied child abuse or causing DeAngelo's injury. Each was advised of Constitutional rights, arrested for endangering a child and transported to the Justice Center where mother gave a statement to the police in which she denied causing injury to DeAngelo. Although step-father agreed to talk to the police he refused to make a written statement. In November 1998, during the ongoing investigation, DeAngelo's social worker, Ms. Bates, informed Detective Lessman of DeAngelo's nightmares of his mother hurting him. In response, Det. Lessman took photographs of DeAngelo's foster mother, mother and step-father to the hospital. When he saw the photographs, DeAngelo wanted to keep the picture of his foster mother, he gave the picture of his mother back, and he became extremely agitated upon viewing the picture of step-father and blurted hurt belly.
Renee Jones, neighbor of the Cheney-Shaw family and friend of Deborah Shaw, testified that she has known the family since the summer of 1997. She described DeAngelo as a docile, playful, lovable child who acted scared around step-father but did not appear frightened of his mother. She said step-father had cautioned her not to baby DeAngelo. She observed DeAngelo suffer injuries during the summer; noting every day or every other day, DeAngelo had a different injury. On one occasion, she witnessed step-father punch DeAngelo in the chest with sufficient force to knock him down. On another occasion, she saw step-father lift DeAngelo by his head and carry him up the stairs. She said step-father whipped DeAngelo when he wet himself. She recalled that in September 1997, Deborah Shaw, DeAngelo's grandmother, told her that DeAngelo had been so severely beaten he was black and blue. As a result, on September 13, 1997 she called 696-KIDS to report the alleged abuse using a fictitious name. Subsequently, step-father told her that he would hurt the person who reported him and hurt that person's child. One night when step-father was ranting and raving about being reported he told her the child would be in worse shape than he already is. Ms. Jones assumed that appellant's threats referred to her because she was the only person in the building with a child and, moreover, her child is handicapped. Ms. Jones called the police on numerous occasions and filed complaints regarding the threats. Then, he threatened her directly stating that he was going to get her and hurt her son. She refused to make a statement to the police in June 1998 because she knew that DeAngelo was safe in the hospital and she was afraid of appellant Shaw.
Stuart Purnell, a CMHA police officer and friend of Ms. Jones, testified that he observed a verbal altercation between appellant Shaw and Renee Jones on November 24, 1998. When he attempted to diffuse the situation by pulling Ms. Jones away, appellant Shaw threatened to kill them both and gestured with his finger. Mr. Purnell advised Ms. Jones to file a report with the Fourth District Police.
At the close of the state's testimony and after admission of the State's exhibits, counsel for each defendant moved for acquittal pursuant to Crim.R. 29. The court granted the motions dismissing counts thirteen, twenty-seven and thirty-two as to mother and counts three, seven and twelve as to step-father, as each dismissed count related to DeAngelo's broken clavicle, an injury for which no evidence was presented.
Appellants' combined defense presented the testimony of seven witnesses. First, mother called Stuart Freedman the CCDCFS social worker assigned to the family from October 7 through December 1, 1997, after DeAngelo was temporarily removed from parental care. Mr. Freedman observed the family visitation with DeAngelo at Metzenbaum Center noting that the family was affectionate and DeAngelo showed no fear. Mr. Freedman said he did not observe signs of abuse and the parents denied abuse, but conceded that Kathy Takas from University Hospital told him that DeAngelo's leg injury was secondary to abuse. He said on October 28th, he received a phone report from Toni Jones who told him that she observed Vincent hit DeAngelo several times in the chest and pick him up and carry him by the head; however, Ms. Jones stated she was unwilling to testify in court. Mr. Freedman conceded that he had suspected that DeAngelo was abused and included this suspicion in his report; but, he admitted that abuse is difficult to pinpoint and prove. When he transferred the case, Mr. Freedman suggested that both parents be considered for family violence or domestic violence counseling.
Ruby Thomas, a friend of the Cheney-Shaw family, testified that during DeAngelo's weekend visitations she stayed with the family from three to five hours each day for support and never observed unusual disciplinary behavior or parental loss of temper. She observed the children to have a good relationship with the parents. She conceded that she never saw DeAngelo have a seizure, never saw him fall down and never saw him bang his head. She concluded that DeAngelo behaved like a normal child.
Robert Powell, overseer of the Warrensville congregation of Jehovah's Witnesses, called by appellant step-father, testified that he has known appellant for twelve years as a member of the congregation. After Ms. Jones advanced allegations of child abuse against appellant Shaw, an investigation was initiated as to the validity of the allegations to determine whether appellant should be dismissed from the congregation. Although Ms. Jones and both appellants voluntarily participated in the investigation, Ms. Jones was accompanied by two other people because she was fearful of her life. The investigation did not result in appellant Shaw's dismissal from the congregation.
Vanessa Johnson, another family friend, testified that in September 1997, while accompanied by her fiance and her son, she was at the Cheney-Shaw home to pick up papers for a dog. While DeAngelo was soaking his leg in the bathtub, they heard a loud noise. Mother went into the bathroom to check on DeAngelo. Ms. Johnson left after they were told that there was a problem. However, that night there was no mention of DeAngelo suffering a seizure.
Deborah Shaw, appellant Vincent Shaw's mother, who lives in the building next door to the family, described her grandson, DeAngelo, as a lovable teddy bear. She recalled the night that DeAngelo sustained the eye injury, noting that her granddaughter came to her home three times for ice. Finally, she went to the Cheney-Shaw apartment where she observed DeAngelo suffering a seizure. He was lying on the bed and remained in seizure until she left. She testified that she has never seen anything to lead her to believe that Sylvia might be causing harm to DeAngelo. She denied that her son Vincent ever threatened her with physical violence and she denied ever making such an allegation in a phone call to the Cleveland Police.
Appellant-mother, Sylvia Cheney-Shaw, testified on her own behalf. She related that she took DeAngelo to his regular check-ups with Dr. Crotser at St. Luke's. She noted that DeAngelo as a newborn cried a lot and his development was slow both in sitting up and walking. Then, at a check-up in February 1995, Dr. Crotser commented on the marks on DeAngelo's body. She told the doctor that she had noticed the blisters and had treated the blisters with cocoa butter and had taken DeAngelo to the doctor. She explained that the blisters could either have been the result of a shot DeAngelo received or inflicted by a babysitter named Ramey. She denied causing the ten burn injuries on DeAngelo's body or having knowledge of the cause of the burns.
She recalled that DeAngelo's first seizure occurred on the Fourth of July 1995 which caused him to fall. At that time she called 911 and DeAngelo was taken to University Hospital. Although he was placed on Tegretol for seizure, she said he still suffered from seizures every two weeks. Her instructions were to wrap him in a blanket and talk to him to prevent shock during a seizure; but, she was advised to take him to the hospital should he remain in seizure for more than twenty minutes. She said DeAngelo was diagnosed as autistic by Dr. Berenson and during one office visit DeAngelo fell off the examining table in the presence of two doctors who told her that was a tendency of autism. She said although DeAngelo's Tegretol dosage had been increased, he continued to have less frequent periodic seizures. She said DeAngelo's self-destructive behaviors include biting himself and hitting his head against the wall.
She stated that although DeAngelo broke his arm on a Monday in March 1996 while bouncing on a bed, she did not seek medical attention immediately because the swelling did not occur until a week later. Then, she took him to the hospital where his arm was placed in a cast for six weeks. She denied causing DeAngelo's broken arm or having knowledge of someone else causing the injury.
In January 1996, she took DeAngelo to the hospital because his hand had swollen. An operation was performed to drain the fluid and DeAngelo remained hospitalized for a couple of weeks. She stated that she was told that the swelling was caused by an insect bite. She denied causing any injury related to the swelling of DeAngelo's hand or having knowledge that someone else caused this injury.
In 1997, one morning when DeAngelo awoke, his chest was swollen and his back was puffy so she took him to the emergency room at University Hospital where she was advised that this condition was also from an insect bite. DeAngelo was not admitted and they returned home. However, the next day when the swelling failed to go down and worsened, they went to the emergency room again. DeAngelo was admitted, given blood tests, bone tests and MRI, which were all negative. The fluid was drained from his chest and DeAngelo remained hospitalized for about a week where she visited him daily. She denied causing or knowing the cause of the swelling in DeAngelo's chest or back.
Later in 1997, she took DeAngelo to University Hospital with a swollen upper thigh. Blood tests, bone tests and MRI were again performed but with negative results. DeAngelo was admitted to the hospital and although his leg was elevated, the swelling increased. She was directed to take him home and let him exercise and play. Mother denied both knowledge or any involvement with DeAngelo's leg injury.
DeAngelo next was taken to the emergency room with injuries in September 1997. She explained that DeAngelo suffered a black eye the night Vanessa came to see about a dog. She described the events as follows. She prepared the bath to soak DeAngelo's swollen leg while Vanessa and her fiance were talking to Vincent. When she went into the kitchen for a minute, she heard a loud noise, she returned to the bathroom and found that DeAngelo had a seizure while in the tub. She took him to the bedroom and covered him with a blanket. She said he came out of his seizure in about five minutes. Although that night she did not observe any marks on him, the next day, DeAngelo had a bloodshot black eye. As a result, she took him to the hospital where she met with the police. At that time, DeAngelo was placed in the care of the county social services.
She testified that by February 1998 the family was permitted supervised visitation with DeAngelo at the Metzenbaum Center every two weeks. In March 1998, she noticed DeAngelo had bruises which she reported. Ultimately, DeAngelo was permitted to come home for unsupervised visitations. His foster mother, Ms. Payne, brought him home on Friday evening at five p.m. and picked him up on Monday morning at eight a.m. Although DeAngelo had a problem getting out of the car, he was not afraid. Then, in June 1998, DeAngelo spent an extended visitation at home from the 18th through Tuesday, the 23rd. On Wednesday and Thursday, DeAngelo was with his foster mother, but on Friday he was dropped off by his foster care giver. Although DeAngelo wanted to stay in the car, she was able to get him out.
She described the events surrounding DeAngelo's perforated intestine as follows. On June 26th, about seven p.m., after DeAngelo ate a hot dog and noodles at his grandmother's house, he vomited and complained that his stomach hurt so she gave him ginger ale and placed him in front of the fan where he fell asleep. In the morning, she woke him, gave him a bath because he had urinated during the night, and gave him Cheerios for breakfast. In the afternoon, DeAngelo vomited after eating chicken broth, so his step-father undressed him to bathe him. When he saw DeAngelo's testicle was enlarged, they placed a call to his foster mother, Ms. Wells; when they were unable to reach her they called 696-KIDS to report DeAngelo's illness. She and her mother-in-law took DeAngelo to St.Luke's Hospital while Vincent remained at home with the other two children. The personnel at St. Luke's Hospital questioned her about DeAngelo's condition, took x-rays and informed her that he had a perforated bowel. He was transported to University Hospital where a lengthy surgery was performed. The doctor told them that the perforation of DeAngelo's bowel came from a blow to his stomach which caused a hole in his upper and lower intestines. She denied causing or knowing the cause of DeAngelo's intestinal injury. She denied ever punching, kicking, slapping or throwing anything at DeAngelo since his birth. She denied ever seeing anyone else injure him.
Appellant denied that in September 1997, when DeAngelo suffered his eye injury, she tried to hide DeAngelo from the social workers who had been sent to their home from CCDCFS. She conceded that she switched hospitals in the past because St. Luke's had accused her of abuse. She admitted that DeAngelo's natural father, Terrance Payne, was violent and abusive to her causing her to fear him for both herself and her children.
Appellant step-father Vincent Shaw testified on his own behalf. He said that the first time he ever saw DeAngelo was in March 1996 and, at that time, DeAngelo's arm was already in a cast. In June 1997, he learned that DeAngelo was autistic after a bed-wetting incident in his home. He then volunteered to potty train DeAngelo by giving him a whooping. He tested DeAngelo's pain response by hitting him with a brush, but DeAngelo did not even flinch.
He and Sylvia were married August 29, 1997 and the family moved in together the following week. In September 1997, he said DeAngelo's fall in the bathtub occurred the time when Vanessa and her fiance came inquiring about purchasing a pit bull dog. That night, Sylvia was soaking DeAngelo's leg in the tub, they heard a noise, Sylvia entered the bathroom first and told him DeAngelo had a seizure. He sent the other children to get his mother and he directed Vanessa to leave. He was able to observe that DeAngelo's face was red, his eyes were blinking and his mouth was moving. The seizure was short and before he knew it DeAngelo was up and playing.
Appellant Shaw denied any prior knowledge of burn marks on DeAngelo's body before 1998 when he was questioned whether he knew who burned DeAngelo. He said that he and DeAngelo's mother took an early honeymoon trip in August 1997 and upon their return August 4th, they picked up the children from Sylvia's mother's house and noticed bumps and lumps on DeAngelo's head and shoulder. Sylvia confronted her mother about DeAngelo's injuries in a heated exchange. First, he and Sylvia took DeAngelo to the police station where they filed a police report against Sylvia's brother for the assault on DeAngelo and then they took him to the hospital.
He described the events surrounding DeAngelo's near fatal intestinal perforation as follows. On that Friday night, after he returned from work, DeAngelo threw up hot dogs and noodles. Sylvia took him into the house, gave him ginger ale and set him in front of a fan to cool off. He called 696-KIDS to inform them that DeAngelo was sick. Later, DeAngelo appeared fine so he called DeAngelo's foster mother to let her know. The next day, when he returned from helping his friend move, he noticed that DeAngelo had vomited. He called 696-KIDS and called DeAngelo's foster mother. He left a message with foster mother's son that DeAngelo was sick. Sylvia and his mother took DeAngelo to the hospital. He denied ever hitting or harming DeAngelo and asserted that he loves DeAngelo.
He testified that he knows Renee Jones through his mother who lives in the same building as Ms. Jones. Although he and Ms. Jones had a social relationship, their interaction stopped because she accused him of abusing DeAngelo. He admitted making statements to Ms. Jones, but he denied having a verbal confrontation with her or threatening her in front of Mr. Purnell.
Each defense rested and the court denied each renewed motion for acquittal made pursuant to Crim.R. 29. The state called two witnesses on rebuttal. First, Detective Karl Lessman testified that although appellant step-father asserted that a complaint was lodged with the Cleveland police on or about August 4, 1997 regarding suspected abuse of DeAngelo by Sylvia Cheney's brother, no such complaint was made. Then, Katherine Funston, pediatric intensive care nurse at Rainbow Hospital, said that despite appellant step-father's testimony that he had not hit DeAngelo, she said that he had described repeatedly hitting DeAngelo's hand with a brush in order to test his endurance of pain. Ms. Funston testified that he told her that he hit DeAngelo hard enough to make an ordinary child cry.
Closing arguments were made and on June 16 1999, the trial court found appellant mother Sylvia Cheney-Shaw guilty of fourteen counts of child endangering in violation of R.C. 2919.22 and not guilty of the remaining charges against her. The court sentenced her to a term of two years on each of counts thirty through forty-one, to run concurrent to each other; and two years each on counts forty-three and forty-four, to run concurrent to each other but consecutive to counts thirty through forty-one.
The court found appellant step-father Vincent Shaw guilty of felonious assault as charged in count four; child endangering as charged in count eight; child endangering as charged in counts eleven, thirteen, and fourteen; and of intimidation of a witness as charged in count sixteen. The court sentenced him to a term of imprisonment of five years each on counts four and eight to be served concurrently, one year on count eleven to run consecutively to count four; two years on count thirteen to run consecutively to counts four and eleven; two years on count fourteen to run concurrent with count thirteen; and two years on count sixteen to run concurrent with count eleven. This court consolidated the timely appeals of Sylvia Cheney-Shaw (appellant mother) and Vincent Shaw (appellant step-father).
On appeal appellant Vincent Shaw advances the following three assignments of error:
 I. THE EVIDENCE PRODUCED AT TRIAL WAS LEGALLY INSUFFICIENT TO SUPPORT A CONVICTION IN COUNTS 4, 8, 11, 13 AND 14.
 II. THE DEFENDANT'S CONVICTION IN COUNT 14 OF THE INDICTMENT VIOLATES HIS RIGHT TO BE FREE FROM DOUBLE JEOPARDY OR IS AN ALLIED OFFENSE OF SIMILAR IMPORT UNDER ORC § 2941.25
 III. THE CONVICTION OF THE DEFENDANT FOR INTIMIDATION OF A WITNESS WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Appellant Sylvia Cheney-Shaw advances the following two assignments of error:
 I. THE APPELLANT'S CONVICTIONS WERE AGAINST THE SUFFICIENCY OF THE EVIDENCE.
 II. THE TRIAL COURT ERRED BY SENTENCING APPELLANT TO TERMS OF INCARCERATION OF TWO YEARS FOR COUNTS 30-40 UNDER SENATE BILL TWO.
We shall discuss appellants' assignments of error out of their predesignated order. Appellants' first assignments of error challenge the sufficiency of the evidence and assert that the evidence presented at trial was insufficient to sustain the convictions entered against them. Specifically, mother contends that her convictions for child endangering by failure to protect DeAngelo from his specific injuries and for child endangering by neglect of DeAngelo from January 30, 1993 to June 27, 1998 were not supported by sufficient evidence. Step-father contends that insufficient evidence was presented to support his convictions for child endangering for his failure to protect DeAngelo as loco parentis from March 1996 to June 1998; for child endangering by his failure to protect and for cruel abuse of DeAngelo in June 1998; for child endangering in September 1997; and for felonious assault upon DeAngelo in June 1998. Moreover, appellants argue that the state failed to demonstrate that they possessed the requisite mental state of recklessness as defined in R.C. 2901.22(C),[1] an, essential element of child endangering. See State v. McGee (1997),79 Ohio St.3d 193. Essentially each appellant claims that the trial court erred in failing to grant their motions for acquittal advanced pursuant to Crim.R. 29. Appellants citing State v. Miley (1996), 114 Ohio App.3d 738, argue that the circumstantial evidence presented demonstrated at best a fifty percent chance of guilt and, thus, is insufficient to prove guilt beyond a reasonable doubt. However, upon a thorough review of the record, we are convinced that although circumstantial, the evidence presented by the state at trial in this case, unlike the evidence in Miley, was more than legally sufficient to prove these offenses.
"Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the jury verdict, State v. Thompkins (1997), 78 Ohio St.3d 380, 387,678 N.E.2d 541, 546." State v. Smith (1997), 80 Ohio St.3d 89,113, 684 N.E.2d 668, 691.
When a defendant challenges the sufficiency of evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia (1979), 443 U.S. 307, 319.
Convictions of child endangering pursuant to R.C. 2929.22 were entered against appellant mother Sylvia Cheney-Shaw in counts thirty through forty-one, forty-three and forty-four and against appellant step-father Vincent Shaw in counts eleven, thirteen and fourteen.
R.C. 2929.22 provides:
 (A) No person, who is the parent guardian custodian person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care protection or support.
Additionally, step-father challenges his conviction for child endangering as set forth in count eight of his indictment pursuant to R.C. 2919.22(B) which states:
 No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age: * * *
(2) Torture or cruelly abuse the child * * *
Finally, appellant step-father challenges his conviction for felonious assault pursuant to R.C. 2903.11 which provides:
 (A) No person shall knowingly: (1) Cause serious physical harm to another or to another's unborn.
The evidence adduced by the state demonstrates that DeAngelo Cheney suffered from multiple serious injuries inflicted upon him from infancy through age five, culminating in June 1998. At the time of his birth his mother exhibited behavior which caused the hospital personnel to call for a social service consultation. At DeAngelo's two month checkup his mother admitted her awareness of DeAngelo's risk of being hurt by either her or his father. She conveyed this information to DeAngelo's pediatrician and she was referred to Bellflower for parenting support. Mother failed to seek assistance. Mother was again encouraged to seek professional assistance due to stressors in the home, but failed to follow through. Mother admitted that the environment in which DeAngelo lived was abusive but she failed to remedy the circumstances. Then, while in the primary care of mother and his natural father, DeAngelo suffered from a series of inflicted second degree burns. Mother denied knowledge of the cause and gave both inconsistent and unreasonable explanations regarding the source and the treatment of the burns.
In March 1996, DeAngelo suffered a broken arm for which mother failed to seek medical attention for over one week and for which she gave evasive, inconsistent and unreasonable explanations to both medical and social service personnel. The record demonstrates that DeAngelo was hospitalized three other times due to unexplained trauma injury while in his mother's care: the swelling of his hand, a mass in his chest, and a hematoma in his thigh. DeAngelo was next hospitalized in September 1997, when he suffered serious eye injury as depicted by photographs, testimony and medical records. The injury caused his blackened eye to fill with blood.[2] Despite efforts of social service personnel to intercede after reports of DeAngelo's abuse at the hands of his mother and step-father, appellants failed to seek medical care for DeAngelo's injuries for four days. The state adduced credible testimony which indicated that these injuries were inflicted upon DeAngelo. This evidence as presented shows that time and time again DeAngelo suffered inflicted injury not consistent with the explanations offered by either mother or step-father. Moreover, the evidence demonstrates that these care givers failed to remedy the circumstances surrounding the infliction of his injuries.
Ultimately, in June 1998, DeAngelo suffered a near fatal perforation of his colon. The state presented credible circumstantial evidence to support the conclusion that this injury was inflicted upon him by appellant step-father while he was in the care of both appellants. The state presented evidence which indicated that such injury could not be self-inflicted or inflicted by another child but would result from a severe blow to the abdomen. A witness testified that on prior occasions she observed DeAngelo's step-father physically abuse him. Specifically, the witness saw step-father administer a punch to the child's chest strong enough to knock him down and she had seen him carry DeAngelo up the stairs by the head. Testimony revealed that DeAngelo exhibited a strong negative reaction when shown a picture of his step-father and blurted hurt belly. It was uncontroverted that DeAngelo was in appellant's care during the time period when the injury occurred.
Therefore, when we view the evidence most strongly in favor of the state, as we must, we find that a reasonable finder of fact could conclude that with heedless indifference to the consequences, both appellants perversely disregarded the known risk of injury to DeAngelo, thereby endangering him by their failure to protect him from serious harm as to the injuries which were inflicted upon him. Further, sufficient evidence demonstrates that step-father, in loco parentis, endangered DeAngelo by cruel abuse in June 1998 and recklessly created a substantial risk to DeAngelo's health and safety by failing to protect him, which resulted in serious harm over the period from March 1996 to June 1998. Finally, we find sufficient evidence was presented to support a finding that step-father knowingly caused the serious harm to DeAngelo in June 1998. Accordingly, appellant Sylvia Cheney-Shaw's and Vincent Shaw's first assignments of error are without merit.
Next, in his third assignment of error, appellant Vincent Shaw alleges that his conviction for intimidation was against the manifest weight of the evidence. In considering a manifest weight claim, `the court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction.'" State v. Thompkins (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 547, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175, 20 Ohio B.Rep. 215, 219,485 N.E.2d 717, 720-721. The "weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" Thompkins, 78 Ohio St.3d at 387, 678 N.E.2d at 546.
To determine whether a conviction is against the manifest weight of the evidence presented, this court examines the entire record to determine whether the evidence produced attains the high degree of probative force and certainty required of a criminal conviction. State v. Getsy (1998), 84 Ohio St.3d 180,702 N.E.2d 866. The question is whether there is substantial evidence upon which a [trier of fact] could reasonably conclude that all the elements have been proved beyond a reasonable doubt. State v. Eley (1978), 56 Ohio St.2d 169, 383 N.E.2d 132, at the syllabus. In determining whether the decision of a trial court is against the manifest weight of the evidence, the following factors are guidelines and may be taken into account by the reviewing court: 1) the reviewing court is not required to accept as true the incredible * * *; 2) whether the evidence is uncontradicted * * *; 3) whether a witness was impeached * * *; 4) what was not proved * * *; 5) the certainty of the evidence * * *; 6) the reliability of the evidence * * *; 7) whether a witness' testimony is self-serving * * *; and 8) whether the evidence is vague, uncertain, conflicting or fragmentary. State v. Mattison (1985), 23 Ohio App.3d 10, 14,490 N.E.2d 926. Moreover, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus; see, also, State v. Smith (2000),87 Ohio St.3d 424. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." See C.E. Morris Co. v. Foley Construction Co. (1978),54 Ohio St.2d 279.
Appellant Vincent Shaw was convicted of the intimidation of Renee Jones, a witness in this criminal case, as charged in count sixteen of the indictment pursuant to R.C. 2921.04, which provides:
 (B) no person, knowingly and by force or by unlawful threat of harm to any person or property, shall attempt to influence, intimidate, or hinder the victim of a crime in the filing or prosecution of criminal charges or an attorney or witness involved in a criminal action or proceeding in the discharge of the duties of the attorney or witness.
The record demonstrates that in the summer of 1997 witness Renee Jones called 696-KIDS to report appellant's abuse of DeAngelo. Ms. Jones testified that appellant made threats regarding the person who called the abuse hotline and threats as to that person's child. Ms. Jones was convinced that the threats were directed at her as she was the only person living in the apartment building who has a child. Ms. Jones reported appellant's threats to the police. A second witness, CMHA policeman Mr. Purnell, testified that while breaking up an altercation between Ms. Jones and appellant, he overheard appellant threatened both his and Ms. Jones' life. Ms. Jones testified that she refused to cooperate with the police in their investigation due to her fear of appellant's reprisal. Moreover, two of appellant's own witnesses confirmed Ms. Jones fears regarding her report of appellant's abusive behaviors. First, Mr. Freedman, the social worker, testified that Ms. Jones refused to make a statement to him due to her fear of reprisal of appellant Shaw. Second, the pastor of appellant's church testified that although Ms. Jones participated in the church investigation of appellant's alleged abuse of DeAngelo, she attended with two other people due to her fear for her life. Appellant, on the other hand, denied that he threatened Ms. Jones. However, appellant acknowledged that he knew that Ms. Jones had reported his alleged abuse of DeAngelo and appellant admitted that he said some things to her.
Keeping in mind that the finder of fact is entitled to believe or disbelieve the testimony of the state's witnesses and/or the defense witnesses (see State v. Antill (1964), 176 Ohio St. 61), when we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, we do not find the court so clearly lost its way and created such a manifest miscarriage of justice that the conviction for intimidation must be reversed. We find appellant Vincent Shaw's third assignment of error to be without merit.
In his second assignment of error, appellant step-father complains that his conviction on count fourteen of the indictment, which charged that from March 1, 1996 to June 27, 1998 he recklessly created a substantial risk to the health of DeAngelo Cheney by violating a duty of care, protection or support resulting in serious physical harm encompasses that for which he has already been prosecuted.
The double jeopardy protections afforded by the federal and state Constitutions guard citizens against both successive prosecutions and cumulative punishments for the "same offense." State v. Moss (1982), 69 Ohio St.2d 515, 518. This case does not involve the successive-prosecution branch of the Double Jeopardy Clause. Instead, step-father objects to convictions for separate offenses that he claims constitute the same offense for double jeopardy purposes.
We note that the Fifth Amendment's Double Jeopardy Clause made applicable to the states by the Fourteenth Amendment and Ohio's counterpart are sufficiently similar to warrant consultation of federal jurisprudence when analyzing Ohio's proscription against placing persons "twice * * * in jeopardy for the same offense." Section 10, Article I, Ohio Constitution. See, e.g., Moss, supra.
With its multiple-count statute, Ohio intends to permit a defendant to be punished for multiple offenses of dissimilar import. R.C. 2941.25(B); State v. Blankenship (1988), 38 Ohio St.3d 116,117. If, however, a defendant's actions "can be construed to constitute two or more allied offenses of similar import," the defendant may be convicted (i.e., found guilty and punished) of only one. R.C. 2941.25(A). But if a defendant commits offenses of similar import separately or with a separate animus, he may be punished for both pursuant to R.C. 2941.25(B). State v. Jones (1997),78 Ohio St.3d 12, 13-14.
Under an R.C. 2941.25(A) analysis, the statutorily defined elements of offenses that are claimed to be of similar import are compared in the abstract. (Newark v. Vazirani (1990), 48 Ohio St. 381[48 Ohio St.3d 81], 549 N.E.2d 520, overruled.) Emphasis in original. State v. Rance (1999), 85 Ohio St.3d 632, paragraph one of the syllabus. Courts should assess, by aligning the elements of each crime in the abstract, whether the statutory elements of the crimes `correspond to such a degree that the commission of one crime will result in the commission of the other.'" Rance, supra at 638. [I]f the elements do so correspond, the defendant may not be convicted of both unless the court finds that the defendant committed the crimes separately or with separate animus. R.C. 2941.25(B); State v. Jones (1997),78 Ohio St.3d at 14, 676 N.E.2d at 81 (a defendant may be convicted of allied offenses of similar import if the defendant's conduct reveals that the crimes were committed separately or with separate animus). Rance, supra at 638-639.
In this case, step-father was convicted of endangering DeAngelo by neglect from March 1996 to June 1998. At trial, credible circumstantial evidence was adduced to show that beyond the specific injuries inflicted upon DeAngelo for which appellant was convicted of endangering him, DeAngelo suffered other abuse and other injury while in step-father's care as loco parentis. Thus, count fourteen, as indicted, reflects appellant's pattern of behavior even beyond the specific instances of abuse contained in the other counts of the indictment and includes behaviors committed separately from and with separate animus than those of which appellant was convicted. As such, count fourteen of the indictment does not constitute an allied offense of similar import pursuant to R.C. 2941.25 to the other charges as brought against him, nor does his conviction constitute double jeopardy. Accordingly, we find appellant step-father's second assignment of error to be without merit.
Finally, in her second assignment of error, mother challenges as improper the sentences as imposed by the court for her convictions of crimes committed prior to July 1, 1996. It is conceded by the state and evident to this court from our review of the record that appellant's convictions for counts thirty through forty of indictment were for the ten burns suffered by DeAngelo prior to his examination on February 23, 1995. Thus, these acts were committed prior to the enactment of S.B. 2 on July 1, 1996 and the sentencing provisions set forth in S.B. 2 do not apply. State v. Rush (1998), 83 Ohio St.3d 53. We find appellant Sylvia Cheney-Shaw's second assignment of error to be well-taken.
Accordingly, all convictions challenged by appellants Vincent Shaw and Sylvia Cheney-Shaw are affirmed. However, the sentences imposed upon Sylvia Cheney-Shaw on her convictions in counts thirty through forty are vacated. Case No. CR-366345 is remanded for resentencing of Sylvia Cheney-Shaw on the convictions based upon her criminal activity which occurred prior to July 1, 1996.
The convictions are affirmed; sentence of appellant Cheney-Shaw is vacated in part; C.P. No. CR-366345 is remanded for resentencing; all for further proceedings consistent with the opinion herein.
It is, therefore, ordered that appellant Sylvia Cheney-Shaw and appellee equally share the costs in C.A. No. 76828. It is also ordered that appellee recover of appellant Vincent Shaw its costs in C.A. No. 76829.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
TERRENCE O'DONNELL, P.J. and MICHAEL J. CORRIGAN, J., CONCUR.
 ___________________________ TIMOTHY E. McMONAGLE, JUDGE
[1] R.C. 2901.22(C) states:
 a person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstance is likely to exist.
[2] We find the evidence presented in this case, unlike the bruised eyelid described in State v. Ivey (1994),98 Ohio App.3d 249, reveals that DeAngelo suffered serious physical harm as contemplated by R.C. 2901.01.