DECISION.
Raising six assignments of error, defendant-appellant Owen Hobbs appeals his conviction, after a jury trial, for the murder of Rashawn Berry, in violation of R.C. 2903.02(A), with a firearm specification.
On Saturday, February 19, 2000, Jeanette Berry testified, her brother Rashawn Berry was waiting in her apartment for Mario Mitchell, as the two men intended to go out together. Shortly before five o'clock, the buzzer, located at the locked entrance to the apartment building, sounded in the apartment. The building entrance area was enclosed in glass. Before she could ask Berry to wait, he went down the stairs to the building's entrance. She heard loud voices, like an argument, then sounds, like firecrackers. She went down to the entrance, where she saw, through the glass, her brother trying to get back inside the building. He had been shot. She stayed with him outside until the paramedics arrived a short time later. Berry suffered fatal gunshot wounds.
Hobbs's ex-wife testified that she lived in the same apartment building as the victim, Berry. During their two marriages, Hobbs had owned as many as two guns. She was not in the apartment building at the time of the fatal shooting, but arrived shortly thereafter. While they were divorced, she did not give Hobbs access to the apartment building, and it was her intent to stay as far away from Hobbs as possible. During cross-examination, when Hobbs was asked if he had ever threatened to kill his ex-wife, he answered, "I probably have." Hobbs confirmed that he had never been inside his ex-wife's apartment building. Hobbs testified that he had been walking towards the front door of the apartment building to get money from her, when he saw two black males arguing. When one pulled out a revolver, he ran away and heard shots. Hobbs testified that he never told his son that he had pressed the buzzer. Accordingly, Hobbs agreed that when his son testified that Hobbs had told him that Hobbs had pressed the buzzer to his ex-wife's apartment building and that he had then gone to the nearby post office where she worked, as she was not at home, his son was mistaken. As Hobbs described his flight from the scene of the shooting, it took him through areas where witnesses saw him that day. Multiple witnesses were able to identify Hobbs by his clothes and/or his physical characteristics, including a white or gray spot on the top of his head, as Hobbs went past them.
At trial, Gina Speaks testified that her apartment building was adjacent to the one where the shooting had occurred. She went to her apartment window when she heard yelling. She saw one man banging on the locked door of the adjacent apartment building. The man standing behind him then pulled out a gun and fired four or five shots. The man who was shot continued to bang on the door for access, but fell backwards on the steps. She testified that the shooter had light-colored blue jeans and a black jacket. She saw him run through the yard, into the parking lot, through other yards, and up the street behind a building where she finally lost sight of him. She identified the man in photographs from the post-office surveillance film due to his clothing, saying, "That's the exact clothing that the shooter was wearing." Mrs. Speaks's daughter Amanda was with her in their apartment at the time of the shooting, but she had no idea what her daughter had been doing at the time of the shooting.
Amanda Speaks testified that she saw one man, who had already been shot, banging on the door of the adjacent apartment building and another man running from the scene. Her description of the runner's path was similar to that given by her mother. She described the clothes of the man who she had seen running from the scene, and that description agreed with the one given by her mother. She further testified that the man running away had a gray spot on the top of his head. In court, she identified that man as Hobbs. She testified that she had told the police about the spot on the top of his head before she saw any photographs from the post-office surveillance film.
The surveillance film taken on the day of the shooting at the nearby post office showed Hobbs arriving with a dark jacket and leaving without it, and it further showed the white spot on the top of his head. Hobbs testified that he had discarded his coat at the post office so that the man involved in the shooting would not recognize him. He testified that a week later, when some friends had seen on television a segment of the surveillance film, he denied to them that the film portrayed him.
In his first assignment of error, Hobbs contends that his conviction was based upon insufficient evidence. To reverse a conviction for insufficient evidence, an appellate court, reviewing the evidence in the light most favorable to the state, must determine that a rational factfinder could not have found the essential elements of the crime proven beyond a reasonable doubt.[1] In doing so, the appellate court may neither resolve evidentiary conflicts in the defendant's favor nor substitute its assessment of the credibility of the witnesses for that of the trier of fact.[2] The verdict must not be disturbed unless reasonable minds could not have found the defendant guilty.[3]
To convict Hobbs of murder and the accompanying firearm specification, the state had to prove that he had a firearm on or about his person or under his control, and that he had displayed, brandished, or used it, or indicated that he possessed it, when he purposely caused the death of Berry.[4]
The state presented the testimony of Gina and Amanda Speaks, whose apartment building was adjacent to the shooting scene. From their apartment window, Gina Speaks had seen the shooter pull out a gun and fire multiple times. She identified Hobbs's clothing, as he appeared in the post-office surveillance film, as matching exactly that of the shooter. Amanda Speaks saw both the victim, after he had already been shot, and another man running from the scene. She described the runner's clothing and his flight from the scene, as had her mother, and the white spot on the top of his head. Amanda Speaks identified Hobbs in court as the man she had seen running away. Hobbs testified that he had been both outside his wife's apartment building and at the post office, where he had left his jacket, on the day of the shooting. The evidence, when viewed in a light most favorable to the state, was sufficient to support Hobbs's conviction. Thus, we overrule the first assignment of error.
In his second assignment of error, Hobbs contends that the jury lost its way in reaching its guilty verdict and created a manifest miscarriage of justice, requiring that he be given a new trial. In a manifest-weight challenge, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.[5] After reviewing the entire record, we are not persuaded that the jury lost its way in this case and created such a manifest miscarriage of justice that we must reverse Hobbs's conviction and order a new trial. Thus, we overrule the second assignment of error.
In his third assignment of error, Hobbs contends that the trial court erred by not granting his motion to suppress the identification evidence. At the suppression hearing, Lieutenant Bruce Plummer confirmed for the trial court that the offense had taken place on February 19, a Saturday. He testified that on the following Monday a jacket matching the description of several witnesses was found underneath a table in the lobby of a post office in the vicinity of the shooting. On Tuesday, a surveillance tape was retrieved from the post office, from which still photographs were made and shown to persons interviewed about the shooting. Hobbs was not identified as a suspect at this time. On Friday evening, after a television report aired, a tip identifying Hobbs was received. Early Saturday morning, Hobbs was arrested. Of all those who testified at the hearing, two witnesses, Messrs. Pegram and Weesner, were shown the photographs after Hobbs was already in custody. Pegram testified that, subsequent to his identification as he was leaving, he asked the officers whether the police had a suspect in custody. Weesner testified, when asked by defense counsel whether the police had suggested to him that the photo of Hobbs was the person he had seen, that no such suggestion had been made. Both Pegram and Weesner confirmed that their identification of Hobbs was based upon what they had seen on the day of the shooting. Not all of the witnesses at the hearing testified at trial.
To challenge the admissibility of identification testimony, a defendant must show that the identification procedure was so unnecessarily suggestive as to compromise the reliability of the identification.[6]
In this case, Hobbs had the burden of showing that the identification procedure was unnecessarily suggestive.[7] If Hobbs failed to meet this burden, then the in-court identification of him by a witness was admissible,[8] and any remaining questions as to the reliability of the identification went to the weight of the evidence, not its admissibility.[9] If Hobbs did meet his burden, then the trial court had to consider whether the procedure was so unduly suggestive as to give rise to a very substantial likelihood of irreparable mistaken identification.[10] In a case such as this, suggestive identification is of concern when witnesses have been shown but one subject.[11] But suggestive identification procedures do not preclude admission where the identification itself is determined to be reliable.[12] Reliability is determined from the totality of the circumstances.[13] In the case at bar, no one-on-one confrontation followed a suggestion by the police that they already had a suspect in custody. Only two witnesses who testified at the suppression hearing were even shown photographs after the police had a suspect in custody, and they testified that that their identification of Hobbs was based upon what they had seen on the day of the murder. Just one of these two witnesses subsequently testified at trial. Under the totality of the circumstances, the trial court overruled Hobbs's motion. While the witnesses were shown photographs only of Hobbs, after reviewing the witnesses' identification testimony under the totality of the circumstances, we cannot say that the trial court erred when it overruled Hobbs's motion. Thus, the third assignment of error is overruled.
In his fourth assignment of error, Hobbs contends that the trial court erred by permitting the state to have two black jurors dismissed. We find no merit in this argument. To establish a prima facie case of racial discrimination in the selection of a jury, the defendant must establish that members of a cognizable racial group have been peremptorily challenged and that the facts and any other relevant circumstances raise an inference that the prosecutor has used the peremptory challenges to exclude jurors on account of their race.[14] If the defendant makes a prima facie case of discrimination, the state must then provide a race-neutral explanation for its use of the challenges.[15] A trial court's finding of no discriminatory intent will not be disturbed unless it is clearly erroneous.[16] The victim and the defendant in this case were African-Americans. Hobbs offered no other circumstances to indicate that jurors were being excluded because of their race, other than that they were African-Americans. We assume, without deciding, that Hobbs established a prima facie case of discrimination. Hobbs first objected when a second African-American juror, Ms. Roberts, was excused. The state explained its removal of Ms. Roberts by stating that she was "evasive" and unresponsive to questioning by the prosecuting attorney, and that her body language differed from that shown to Hobbs's counsel. As valid, race-neutral reasons for excusing the prospective juror were given, we cannot say that the trial court's finding of no discriminatory intent was clearly erroneous. Thus, we overrule the fourth assignment of error.
In his fifth assignment of error, Hobbs contends that the trial court erred by giving improper jury instructions. As Hobbs did not object to those instructions at trial, he has waived all but plain error.[17] The failure to object constitutes a waiver of any claim of error, unless, but for the error, the outcome of the trial clearly would have been otherwise.[18] "A single instruction to a jury may not be judged in artificial isolation but must be viewed in the context of the overall charge."[19] Hobbs's reliance on the phrase "just because he was convicted before, he's automatically guilty of this" is selective quoting, as the rest of the trial court's statement was, "[B]ut you may use it to test his credibility, whether or not you would believe him." Further, immediately preceding the challenged instruction, the trial court stated,
 [T]here was testimony that the defendant, Mr. Hobbs, was convicted of a prior criminal act. This testimony may be considered by you for the purpose of helping you test his credibility, his believability, but you may not use it for any other purpose. * * *
 The transcript clearly shows that the trial court used the challenged instruction as an example of what would have been an improper use of a prior conviction.
Prior to reading both verdict forms, the trial court told the jury that there were two possible verdicts. While the not-guilty verdict form was read second, the trial court stated, and then repeated, that it was the second of two possible verdicts. The two challenged jury instructions did not constitute plain error because it does not appear that, but for the errors, the outcome of the trial clearly would have been otherwise. Thus, we overrule the fifth assignment of error.
In his sixth assignment of error, Hobbs contends that he was deprived of a fair trial when the trial court failed to sustain his objections to improper comments made both in the prosecutor's opening argument and in the closing argument. The test for prosecutorial misconduct is whether remarks were improper, and, if so, whether they prejudicially affected substantial rights of the accused.[20] The touchstone of the analysis is the fairness of the trial, not the culpability of the prosecutor.[21]
In opening argument, the prosecutor stated that Hobbs's ex-wife would tell the jurors that threats of violence were part of the reason for their divorce. While there was an objection to this statement, it was not ruled upon by the trial court. The prosecutor's comment could have been construed as improperly suggesting a prior propensity for violence. But Hobbs's ex-wife was permitted to testify that when Hobbs had been to her apartment building on occasions prior to the day of the shooting, she had not permitted him to enter the apartment building, and that she had stayed as far away from him as she could. During cross-examination, when Hobbs was asked whether he had ever threatened to kill his ex-wife, he answered, "I probably have." In light of this testimony, the challenged remark was an isolated statement and was not outcome-determinative.
In closing argument, the prosecutor stated that two females had been the occupants of a white car. The trial court did not err when it overruled Hobbs's objection to this, because there had been testimony from Officer Christopher Fritsch that the white car's occupants were two black females, but that they had been patronizing a restaurant when he encountered them, and had not been in the white car. But, even if this was a misstatement of fact, it was not essential to a determination of Hobbs's guilt or innocence and, thus, was not outcome-determinative. When the prosecutor's two statements are evaluated in the context of the entire trial, we are convinced that Hobbs was not deprived of a fair trial. Thus, we overrule the sixth assignment of error.
Therefore, the judgment of the trial court is affirmed.
 ______________________ Winkler, Judge.
 Gorman, P.J., and Shannon, J., concur.
Raymond E. Shannon, retired, of the First Appellate District, sitting by assignment.
[1] See Jackson v. Virginia (1970), 443 U.S. 307, 319, 99 S.Ct. 2781,2789; State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[2] See State v. Mechlem (Jan. 24, 1996), Hamilton App. No. C-950328, unreported, citing State v. Waddy (1992), 63 Ohio St.3d 424, 430,588 N.E.2d 819, 825, certiorari denied (1992), 506 U.S. 921,113 S.Ct. 338; State v. Williams (1997), 79 Ohio St.3d 1, 10, 679 N.E.2d 646, 656, certiorari denied (1998), 522 U.S. 1053, 118 S.Ct. 703.
[3] See State v. Jenks, supra, at 273, 574 N.E.2d at 503.
[4] See R.C. 2903.02(A).
[5] See State v. Thompkins (1997), 78 Ohio St.3d 380, 387,678 N.E.2d 541, 547; State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717, 720.
[6] See State v. Wills (1997), 120 Ohio App.3d 320, 324, 697 N.E.2d 1072,1075; State v. Hairston (June 11, 1999), Montgomery App. No. C.A. Case No. 17218, unreported.
[7] See State v. Wills, supra, at 324, 697 N.E.2d at 1075; Statev. Sims (1984), 13 Ohio App.3d 287, 288, 469 N.E.2d 554, 556.
[8] See State v. Simpson (June 20, 1990), Hamilton App. No. C-890368, unreported.
[9] See State v. Wills, supra, at 325, 697 N.E.2d at 1075.
[10] Id. at 324, 697 N.E.2d at 1075; Simmons v. United States (1968),390 U.S. 377, 384, 88 S.Ct. 967, 971.
[11] See Manson v. Brathwaite (1977), 432 U.S. 98, 116, 97 S.Ct. 2243,2254; Neil v. Biggers (1972), 409 U.S. 188, 195, 93 S.Ct. 375, 380;Stovall v. Denno (1967), 388 U.S. 293, 302, 87 S.Ct. 1967, 1972.
[12] See State v. Moody (1978), 55 Ohio St.2d 64, 67, 377 N.E.2d 1008,1010.
[13] See Neil v. Biggers (1972), 409 U.S. 188, 199, 93 S.Ct. 375,382.
[14] See Batson v. Kentucky (1980), 476 U.S. 79, 96,106 S.Ct. 1712, 1723.
[15] Id.; State v. Hill (1995), 73 Ohio St.3d 433, 445, 653 N.E.2d 271,282.
[16] See State v. Hernandez (1992), 63 Ohio St.3d 577, 583,589 N.E.2d 1310, 1314.
[17] See State v. Jalowiec (2001), 91 Ohio St.3d 220, 226,744 N.E.2d 163, 176, citing State v. Slagle (1992), 65 Ohio St.3d 597,604, 605 N.E.2d 916, 925.
[18] See State v. Underwood (1983), 3 Ohio St.3d 12, 444 N.E.2d 1332, syllabus; State v. Long (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph two of the syllabus; State v. Jalowiec, 91 Ohio St.3d at 230,744 N.E.2d at 176.
[19] See State v. Price (1979), 60 Ohio St.2d 136, 398 N.E.2d 772, paragraph four of the syllabus.
[20] See State v. Smith (2000), 87 Ohio St.3d 424, 442, 721 N.E.2d 93,112, citing State v. Smith (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883,885.
[21] See id., citing Smith v. Phillips (1982), 455 U.S. 209, 219,102 S.Ct. 940, 947.