DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment of the Erie County Court of Common Pleas that found appellant guilty of one count of having a weapon while under disability, one count of aggravated burglary, three counts of felonious assault and three counts of attempted kidnapping. The trial court ordered appellant to serve a total of 35 years imprisonment. For the following reasons, this court affirms appellant's convictions but remands the matter to the trial court for resentencing pursuant toState v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856.
 {¶ 2} In support of his appeal, appellant sets forth the following assignments of error:
 {¶ 3} "First Assignment of Error
 {¶ 4} "The trial court violated Mr. Fulton's rights to due process and fair trial when it convicted and sentenced him, even though the conviction was against the manifest weight of the evidence. (Tr., passim; Apr. 8, 2005 Judgment Entry).
 {¶ 5} "Second Assignment of Error
 {¶ 6} "The trial court denied Mr. Fulton due process of law and the right to a jury trial, in violation of the Fifth, Sixth, andFourteenth Amendments to the United States Constitution, by sentencing him to prison based on facts not found by the jury or admitted by him. (Tr., passim; Apr. 8, 2005 Judgment Entry)."
 {¶ 7} After all briefs were submitted, appellant requested and was granted leave to supplement briefing. Appellant then filed the following additional assignments of error:
 {¶ 8} "Supplemental Assignment of Error I:
 {¶ 9} "The trial court violated Fulton's constitutional right to confront witnesses by allowing the State to introduce testimonial hearsay statements through the testimony of Officer DeFelice. Sixth andFourteenth Amendments to the United States Constitution, Section 10, Article I of the Ohio Constitution. Crawford v. Washington (2004),541 U.S. 36. (Vol. III, Tr. 472 and 474)
 {¶ 10} "Supplemental Assignment of Error II:
 {¶ 11} "Thomas Fulton was denied the effective assistance of counsel.Sixth and Fourteenth Amendments to the United States Constitution, Section 10, Article I of the Ohio Constitution. (Vol. III, Tr. 54; Vol. IV, Tr. 6-11, 48; Vol. IV, Tr. 19-37)
 {¶ 12} "Supplemental Assignment of Error III:
 {¶ 13} "The trial court erred by imposing a six year term of imprisonment for a repeat violent offender specification on the basis of findings made by the trial court pursuant to an unconstitutional statutory felony sentencing scheme. Sixth andFourteenth Amendments to the United States Constitution, Section 10, Article I of the Ohio Constitution. Blakely v. Washington (2004), 542 U.S. 296,124 S.Ct. 2531, State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-845. (Vol. VI, Tr. 1053-54; Judgment Entry State v. Fulton, Fulton County C.P. Case No. 2004-CR-181)"
 {¶ 14} The facts relevant to the issues raised on appeal are as follows. On April 16, 2004, appellant was indicted on one count of having a weapon while under disability in violation of R.C. 2923.13(B), one count of aggravated burglary in violation of R.C. 2911.11(A)(2), three counts of felonious assault in violation of R.C. 2903.11(A)(2), and three counts of kidnapping in violation of R.C. 2905.01(A)(2). Each count except the first carried a firearm specification and all eight counts carried repeat violent offender specifications. The charges arose from the state's allegations that on March 12, 2004, appellant broke into the home of Paul and Thelma Carol Ebinger while the Ebingers and their adult daughter Doreen were present, assaulting the family and preventing them from leaving.
 {¶ 15} Appellant entered pleas of not guilty to each count in the indictment and the matter proceeded to a jury trial. During trial, the state moved to amend the three kidnapping charges in the indictment to attempted kidnapping. The motion was granted. On April 5, 2005, the jury found appellant guilty of all counts. Appellant's aggregate sentence was 35 years. This timely appeal followed.
 {¶ 16} In his first assignment of error, appellant asserts that his conviction was against the manifest weight of the evidence. Appellant argues that the evidence presented by the state was contradictory and confusing and more consistent with his version of events than with the state's account.
 {¶ 17} The "weight of the evidence" refers to the jury's resolution of conflicting testimony. State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52. In determining whether a verdict is against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and "* * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id. If the prosecution presented substantial evidence upon which the trier of fact reasonably could conclude, beyond a reasonable doubt, that the essential elements of the offense had been established, a reviewing court will not reverse the judgment of conviction as against the manifest weight of the evidence.State v. Eley (1978), 56 Ohio St.2d 169, syllabus.
 {¶ 18} We note that appellant does not present specific arguments as to each of the separate charges against him, but claims in general that the evidence supported his defense that he went to the victims' home to discuss money Paul Ebinger owed him for guns he said he sold Paul nearly 20 years ago.
 {¶ 19} It is primarily for the factfinder to determine the credibility of the witnesses and the weight to be given to their testimony, because the factfinder has the opportunity to see and hear the witnesses and observe their demeanor. State v. DeHass (1967), 10 Ohio St.2d 230, 231.
 {¶ 20} Paul, Thelma and Doreen Ebinger all testified as to the events of March 12, 2004, and identified appellant as the person who broke into their home. Appellant was wearing a ski mask which he pulled down after he entered the house. Paul Ebinger, who was 69 years old at the time, testified that after appellant came through their back door and into the kitchen, he and appellant struggled, both ending up on the kitchen floor. Paul attempted to grab the gun from appellant and picked it up after it fell to the floor. Paul recalled shooting appellant several times before appellant ran out the back door, got into his car and drove away.
 {¶ 21} Thelma Ebinger, 66 at the time of the burglary, testified that she had walked into the kitchen when she heard appellant come in and said he ordered her to go to the living room. She stated he was wearing jeans, a denim jacket and a dark ski cap which he pulled over his face as he walked in. Appellant told Thelma and Doreen to sit in the living room. After her husband and appellant began to struggle she heard two gunshots. She then went into the bedroom and got a gun, at the same time telling Doreen to call 9-1-1. Thelma went into the kitchen, aimed the gun and pulled the trigger but the gun was not loaded. She hit appellant on the head with the gun and then went back to the bedroom, returning with another gun. When the second gun failed to fire, she again struck appellant on the head several times until his gun fell on the floor. She testified that she recalled hearing four gunshots in the kitchen during the struggle.
 {¶ 22} Doreen Ebinger testified that she was in her parents' bedroom when appellant came in. He was wearing a ski mask, but did not pull it over his face right away. As she walked into the living room, appellant told her to stay there. She further testified that she saw appellant take a gun out of his pocket as he and her father walked into the living room. She stated that when appellant pointed the gun at her father, the men began to struggle, ending up in the kitchen. Doreen then called 9-1-1. She testified that she heard two gunshots come from the kitchen. She further stated that while her father and appellant were fighting she saw her mother go into the bedroom twice, coming out with a gun each time. Doreen testified that she heard at least five gunshots.
 {¶ 23} Deputy Beth Beatty testified that she was the first officer to arrive on the scene. Thelma Ebinger, who was frantic and visibly shaken, met her in the driveway. One of Thelma's hands was bloody. As they walked to the house, Doreen came out and also appeared shaken and upset. When Beatty and Sergeant Kautz, the next officer to arrive, walked in the back door they saw Paul Ebinger standing there with a gun in his hand. The deputy testified that Paul did not want to hand over the gun and "appeared to be in fear of his life." Sergeant Kautz had to grab Paul's arm in order to remove the gun from his hand, which was covered in blood. Beatty observed a handgun on the kitchen floor, which she was later told was the gun used in the shooting. Doreen gave Beatty a description of the vehicle driven by their assailant, which the officer relayed to dispatch. Paul told the officers he thought he had shot the intruder. Beatty spoke to Thelma, who also was frantic and visibly shaken. Sergeant Kautz testified that when he arrived on the scene, Thelma and Doreen were "highly excited to the point of being terrified." He testified further that when he saw Paul in the doorway the man was shaking. He ordered Paul to put the gun down but Paul was afraid the intruder was going to return. Kautz told Paul the officers had secured the scene and pulled the gun from his hand.
 {¶ 24} Detective Robert Lippert testified that shortly after he arrived on the scene he received a call telling him that an ambulance had been dispatched to an auto dealership about ten miles from the Ebingers' home after a man drove up and told someone he had been shot. The detective later determined the injured individual was appellant. When the detective processed the scene, he found several bullet holes in the kitchen but was unable to recover any slugs. Lippert testified that when he searched appellant's car he found a denim jacket matching the description given by the victims soaked in blood with several bullet holes in it. In the jacket pocket was a roll of duct tape and in the car was a receipt for duct tape purchased the morning of the burglary. The fresh roll of tape was opened and folded back on the end to make it easier to unroll. He also found a gun holster under the driver's side of the front seat and a black or navy blue ski mask on the seat. The gun found on the kitchen floor fit perfectly into the holster. Lippert confirmed that none of appellant's blood was found at the scene. He testified there were several reasons for that: appellant was shot with a .22 caliber round, which does not normally cause a lot of damage; none of appellant's major arteries were hit; he left the house right after he was shot, and his several layers of clothing — a thermal shirt, sweatshirt and jacket — absorbed a lot of blood initially. The detective testified that Paul Ebinger was not able to recall exactly how many times he fired the gun at appellant.
 {¶ 25} Appellant testified that in April 2003, he called Paul Ebinger inquiring about $5,000 Paul owed him. He testified he saw Paul again in November 2003 and January 2004, when he and two other men went to Paul's house to deliver firewood. Appellant testified that he robbed a gun shop in 1987, and sold the guns and some other items to Paul for $6,500. He stated that Paul gave him $1,500 at that time and agreed to give him the remaining $5,000 within a few weeks. Appellant testified that shortly thereafter he was arrested and convicted for the robbery and served 16 years in prison. He further testified that Paul never gave him the rest of the money. He stated that in February 2004, after he was released from prison, he went to Paul's house to try to get the money but was unsuccessful. Appellant further testified that he went to Paul's house again on March 12, 2004, to try to "smooth things over." He stated that when he drove up to the house, Paul was in his garage working on a car. He testified that as he walked toward the garage, Paul reached for a gun and the two men struggled, ending up on the ground in the garage. He testified further that as they struggled Paul's wife attempted to shoot him but missed. Appellant stated that he stepped away from Paul and was shot several times when he tried to get the gun. He denied taking a gun with him to the Ebingers' home. Appellant further testified that the gun holster found in the car he was driving on the day of the robbery belonged to his girlfriend's sons.
 {¶ 26} On cross-examination, appellant admitted he had a prior conviction for aggravated robbery and two counts of kidnapping. In that offense, the victims were elderly and he admitted he sprayed one of them in the eyes with mace. He also admitted to convictions for theft of a firearm and grand theft, as well as another aggravated robbery in which the victims were two elderly men who were assaulted and bound with duct tape.
 {¶ 27} When the prosecutor informed appellant she had an audiotape of phone calls he made from jail that morning, appellant admitted calling his ex-wife, who was going to be one of his witnesses, and telling her to be sure to "study [her] notes" before testifying.
 {¶ 28} The jurors in this case obviously chose to believe the version of events as relayed by the victims and the other witnesses introduced by the state. Contrary to appellant's assertion, the evidence presented by the state was not contradictory or confusing and did not support his claim that he merely went to the Ebingers' home to talk to Paul. Upon thorough review of the transcript of the trial, we are unable to find that the trial court lost its way or created a manifest miscarriage of justice by finding appellant guilty of having a weapon under disability, aggravated burglary, attempted kidnapping, felonious assault, having a firearm under his control while committing the offenses, and being a repeat violent offender. Based on the foregoing, appellant's first assignment of error is not well-taken.
 {¶ 29} In the interest of clarity, we will address the remainder of appellant's assignments of error out of order.
 {¶ 30} In his first supplemental assignment of error, appellant asserts that his right to confront witnesses was violated when the court allowed the state, through the testimony of one of the investigating officers, to introduce statements he claims constituted hearsay. Appellant argues that Officer DeFelice improperly recounted testimony given by one of appellant's co-defendants at appellant's 1987 trial for robbing a gun shop. Appellant cites Crawford v. Washington (2004),541 U.S. 36, for its holding that the Confrontation Clause bars the introduction of testimonial out-of-court statements made by a witness not present at trial unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine.
 {¶ 31} At trial, the state questioned Officer DeFelice about appellant's prior record in order to prove the repeat violent offender specifications attached to each of the eight counts. In so doing, the state asked the officer about his investigation several years earlier of a theft which led to appellant's convictions for aggravated robbery, kidnapping, theft of firearm with a specification of a prior offense of violence, and grand theft with a specification of a prior offense of violence. The state then asked the officer if any of the stolen firearms were recovered. Officer DeFelice answered that only one was recovered and stated that he did not know what happened to the others. The state then asked, "Was there any indication that they were taken to Michigan?" Officer DeFelice responded, "There was a statement by a codefendant that they were taken to Michigan."
 {¶ 32} Appellant asserts that the statement that his codefendant said the firearms were taken to Michigan violated his right of confrontation.
 {¶ 33} First, we note that trial counsel did not object to the prosecutor's question about the stolen guns or the officer's answer. Because defense counsel failed to object to the alleged improper testimony, appellant waived all but plain error. State v. Slagle (1992),65 Ohio St.3d 597, 604, certiorari denied (1996), 516 U.S. 1052; Crim. R. 52(B). "When a court of appeals engages in a plain-error analysis, it must conduct a complete review * * * in order to determine whether a manifest miscarriage of justice has occurred that clearly affected the outcome of the trial." State v. Hill (2001), 92 Ohio St.3d 191,2001-Ohio-141, syllabus. In other words, we must determine whether the jury would have convicted appellant even if the alleged errors had not occurred. Slagle, supra, at 605. "Notice of plain error under Crim. R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice."State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus.
 {¶ 34} This court has considered the entire record of proceedings that was before the trial court and, upon consideration of the abundant testimony supporting conviction, we find no indication that a manifest miscarriage of justice occurred that clearly affected the outcome of appellant's trial. We are unable to find that the statement referring to some stolen guns being taken to Michigan 20 years ago affected the outcome of appellant's trial. Accordingly, Officer DeFelice's statement does not rise to the level of plain error. Appellant's first supplemental assignment of error is not well-taken.
 {¶ 35} In his second supplemental assignment of error appellant asserts he was denied effective assistance of counsel because counsel did not object to the testimony discussed above. Because we determined that the statement was not prejudicial and did not affect the outcome of the trial, defense counsel's decision not to object to the testimony does not mandate a finding of ineffective assistance of counsel. SeeState v. Smith (2000), 87 Ohio St.3d 424, 440, 2000-Ohio-450. Appellant's second supplemental assignment of error is not well-taken.
 {¶ 36} We will address appellant's second assignment of error in his original brief and the third assignment of error in his supplemental brief together as both raise sentencing issues. Appellant's original second assignment of error was filed January 17, 2006, which was five weeks before the decision of the Supreme Court of Ohio in State v.Foster, 109 Ohio St.3d 1, 2006-Ohio-856 was released. In that assignment of error, appellant asserts the trial court relied at sentencing on findings that had not been made by a jury or admitted by him. Since it was drafted pre-Foster, appellant's original argument relied on the decision of the United States Supreme Court in Blakely v.Washington (2004), 542 U.S. 296, which held that a sentencing court may not impose a non-minimum sentence based on factual findings neither admitted by the defendant nor found by a jury. In response to appeals based on Blakely, this court subsequently determined that theBlakely decision was not applicable to Ohio's sentencing statutes. See, e.g., State v. Curlis, 6th Dist. No. WD-04-032, 2005-Ohio-1217. However, in February 2006, the Supreme Court of Ohio followed Blakely and held that portions of this state's sentencing statutes violated a defendant'sSixth Amendment right to a trial by jury. State v. Foster,109 Ohio St.3d 1, 2006-Ohio-856. The Foster court severed those statutes, thereby allowing trial courts full discretion when imposing prison sentences in most situations. Foster at ¶ 100. Foster directed that any case pending on direct review at the time of its release be remanded to the trial court for a new sentencing hearing in accordance with its holding.Foster at ¶ 104. Foster was decided on February 27, 2006; appellant's appeal was pending before this court at that time.
 {¶ 37} As his third supplemental assignment of error, filed after theFoster decision was released, appellant asserts on authority ofFoster that the trial court erred by relying on one of the severed statutes when it imposed sentence for the repeat violent offender specification.
 {¶ 38} The trial court, in reliance on now-severed statutes, sentenced appellant to the maximum sentences for having a weapon while under disability, aggravated burglary, felonious assault and attempted kidnapping. Appellant also was sentenced to three years for a firearm specification and six years for the repeat violent offender specification. Some of the sentences were ordered served concurrently and others were ordered to be served consecutively. When imposing appellant's sentences, the trial court referenced R.C. 2929.14(B), (C), (D) and (E), all of which were severed by the Foster decision.
 {¶ 39} Because Foster followed Blakely, we find appellant's second original assignment of error well-taken. Additionally, appellant's third supplemental assignment of error is well-taken in light of State v.Foster, supra.
 {¶ 40} On consideration whereof, the judgment of the Erie County Court of Common Pleas is affirmed as to appellant's conviction but reversed as to his sentence and remanded for a new sentencing hearing in conformity with Foster, supra. Appellant and appellee are ordered to share equally the costs of this appeal pursuant to App. R. 24.
Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Erie County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist. Loc. App. R. 4.
Peter M. Handwork, J., William J. Skow, J., George M. Glasser, J., CONCUR.
Judge George M. Glasser, retired, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.
 This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.